H. HERPOLSHEIMER COMPANY ET AL., APPELLEES, V. LINCOLN TRACTION COMPANY, APPELLANT.*

FILED MAY 4, 1914. No. 17,666.

1. **State Railway Commission:** JURISDICTION: STREET RAILWAYS. By the constitutional amendment of 1906 and the statute pursuant thereto, the power and *duty* of the state railway commission "shall include the regulation of rates, service, and general control of common carriers."

2. ———: ———: ———. The street railways of the city of Lincoln are under the jurisdiction of the state railway commission, and it is the *duty* of the commission to regulate such services.

3. **Street Railways:** DISCONTINUANCE OF SERVICE: INJUNCTION. When a company has obtained a franchise from the city to construct and operate its railway on certain streets of the city, and has constructed its

---

*Rehearing denied. See opinion, 97 Neb. ——.

tracks and is operating its cars thereon pursuant to such franchise right, it will be enjoined from removing such lines or withdrawing its cars from such service without first obtaining authority from the state railway commission so to do.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE. *Affirmed as modified.*

*C. S. Allen, E. J. Hainer* and *Hall & Bishop,* for appellant.

*Frank E. Edgerton* and *C. Petrus Peterson, contra.*

SEDGWICK, J.

Before the year 1905 the Lincoln Traction Company owned and was operating lines of street railway in the city of Lincoln, some of which lines extended outside of the corporate limits of the city. In that year the Citizens Railway Company was organized, and constructed and operated lines of street railway over other public streets of the city, some of the said lines also extending outside of the limits of the city. It constructed what is known as "Loop No. 1" in the central part of the city, from the intersection of N and Twelfth streets, two blocks north to the intersection of Twelfth and P streets, thence one block west to Eleventh street, and thence south along Eleventh street to N street, and east on N street to the intersection of Twelfth street. Also a line from the intersection of N and Twelfth streets along N street to Twenty-ninth street, and one along Twelfth street from N street to South street, and thence east on South street to Twenty-sixth street. It also constructed several lines connected directly and indirectly with the said loop at the intersection of N and Twelfth streets. Afterwards, in 1909, the two companies were consolidated, and both properties taken over by the defendant, the Lincoln Traction Company. A corporation, known as the Citizens Interurban Railway Company, was organized by some, if not all, of the principal stockholders of the Citizens Railway Company. It built a road from the village of College View to the intersection of Twenty-sixth and South streets in the city of

Lincoln. The Citizens Railway Company had for some time before the commencement of this action operated its cars over this line to and into the city of Lincoln over South and Twelfth streets. After the consolidation the defendant abandoned some parts of the said line formerly owned and operated by the Citizens Railway Company, and the plaintiff began this action in the district court for Lancaster county to enjoin the defendant, its officers and agents, "from ceasing to operate a line of street cars around said Loop No. 1 and over said Twelfth street to South street, and thence east to Twenty-sixth street, and thence over said 'High Line' to the village of College View, and back and around said Loop No. 1," and from "abandoning any of the lines of street cars and street car service which were owned and operated by said Citizens Company prior to the said alleged consolidation; that they may be required to forthwith operate said line of street cars from the intersection of N and Twelfth streets south on Twelfth street to South street, and thence east on South street to Twenty-sixth street, and thence over said 'High Line' to College View and back, and to give the same street car service that there was over said line on Twelfth street and to said village of College View and back that was given prior to said alleged consolidation; that defendant may be required to restore the street car service on all the lines which it has abandoned, and that it may be required to operate all of its cars around said Loop No. 1, and give the same service on said cars that was given and afforded by said Citizens Company prior to said alleged consolidation." Seventeen citizens, who claimed to be interested in the Twelfth street line, and an organization, styled the Public Service League of Lincoln, united in a petition in intervention, alleging generally the interest of each in the Twelfth street line, and alleging that the petitioners and many other citizens named in the petition "will be without remedy at law and will suffer irreparable damage should the prayer of plaintiff to this action be denied." Afterwards other citizens joined in this petition in intervention. The prayer of the interveners was sub-

stantially the same as to the Twelfth street line as the prayer of the petitioners. The defendant answered, admitting the allegations of the petition as to the organization of the various companies, and their construction and operation of the street car lines described in the petition, and the consolidation of the Citizens Railway Company and the Lincoln Traction Company, and denied generally the other allegations of the petition. The plaintiffs and the interveners filed replies to the answer of the defendant in the nature of general denials. The trial court made quite extensive findings of fact, and enjoined the defendant, its officers and agents, "from abandoning Loop No. 1 as herein described, and from abandoning the South Twelfth street line from Twelfth and N streets to South street, and thence east on South street to Twenty-sixth street, and from abandoning any of the lines formerly operated by the Citizens Railway Company now operated around Loop No. 1, and from changing the routing of the cars of said lines from the route over which they are now operated, and especially from routing any of said lines so as to remove the same from said Loop No. 1," and "that the defendant do forthwith restore and operate the line of street cars from the intersection of N and Twelfth streets south on Twelfth street to South street, and thence east on South street to Twenty-sixth street, and thence over said High Line to College View and back, and give the same street car service over the south Twelfth street line and 'High Line' to said village of College View and back that was given by the Citizens Company over said lines prior to the consolidation;" and "that the plaintiffs and interveners recover their costs in this action as taxed at $———." The defendant has appealed.

The petition alleges that the plaintiff Henry Herpolsheimer is the owner of several lots in the city of Lincoln, located at the intersection of N and Twelfth streets, and that there is a large store building on these lots fronting on N and Twelfth streets, and that the plaintiff H. Herpolsheimer Company has occupied the building as a place for conducting a general merchandise business, and has,

at all times mentioned in the petition, carried a stock of merchandise in said building of the value of more than $100,000, and that, when the Citizens Railway Company was organized, at the request of that company the said Henry Herpolsheimer took 10 shares of stock therein and paid therefor $1,000; that, in consideration of the taking of said stock by the said Herpolsheimer, and for other considerations set out at large in the petition, the officers and promoters of the Citizens Railway Company assured the said Herpolsheimer "that there would be no change in the operation of cars over said Twelfth street from the intersection of N and Twelfth streets to and from said College View, or in the operation of cars over said Loop No. 1." This contract is urged as one of the reasons for enjoining the defendant as prayed in the petition. The defendant, in the briefs, insists that the plaintiffs are not entitled to the injunction because the state railway commission has exclusive jurisdiction of the matters and things complained of in their petition.

The constitutional amendment of 1906 provides: "The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision." Const., art. V, sec. 19a. The statute enacted pursuant thereto provides: "The commission shall have the power to regulate the rates and services of, and to exercise a general control over all railroads, * * * and all other common carriers." Rev. St. 1913, sec. 6107. There is no doubt that the building and operation of a street railway line through the city affects the values of property in the vicinity, and the financial interests of the citizens, as well as their convenience and other interests. Substantial changes in the service may affect those values and interests either favorably or unfavorably. It is alleged that the principal stockholders and officers of the defendant railway company are largely interested in property and different lines of business in the city, and that

the proposed changes of the routing of the street cars, and other proposed changes in the service, are for the benefit and in the interests of those officers and directors, and not in the interest nor for the benefit of the public at large, and that such changes would be highly injurious to the property and business of these plaintiffs, as well as to the value of the property and the interests of the interveners who reside upon, or in the vicinity of, the Twelfth street line. When such changes are made they should be made in the interest of the public generally, and the rights of the street railway company, the economy and efficiency of the service, and the interests of the citizens whose property rights and convenience are especially affected, should all be considered. Contracts between individuals and public service companies which are for their benefit alone should also be considered, so far as those contracts do not interfere with the superior rights of the general public. There is no doubt that such matters are within the purview of the constitutional provision and the statute above quoted, which provide that the state railway commission shall have power to regulate the service and control common carriers of passengers. It appears that changes of this kind have been made by the street railway company, and that such changes have been by the company reported to the state railway commission from time to time, but it does not appear that these changes were authorized by the state railway commission, nor that any application has been made to that commission for authority to make such changes. The power to regulate rates of common carriers would be incomplete and comparatively useless without the corresponding power to regulate the service, and control the common carrier in performing such service, and these powers are expressly given to the state railway commission by the terms of the constitution, and the statute enacted thereunder. It seems clear that these provisions prevent the defendant from making such changes in the service without first obtaining the authority of the state railway commission so to do.

In determining such matters the state railway commission is not required to adjudicate the alleged contracts between individuals and the defendant, nor to determine as to the existence of alleged conspiracy between the stockholders and officers of the defendant to violate such contract and to injure the plaintiffs. These are judicial questions, and the courts are not deprived of jurisdiction thereof by the constitutional amendment and statutes referred to. *State v. Chicago & N. W. R. Co.*, 83 Neb. 524. But the railway commission should consider the proposed changes in the service as affecting the public interests, and whether and to what extent the interests of the general public would be affected by the enforcement of such private contracts. They will take a general view of the whole situation, and determine the necessity and propriety of the proposed changes, having due regard to the rights of the defendant, and economy of service, and the interests of all parties concerned, and especially the superior rights of the general public.

The decree is modified so as to apply to the line of the Citizens Interurban Company from College View to the intersection of Twenty-sixth and South streets in the city only so far as this defendant controls the bringing of cars from over that line into the city of Lincoln and to the business section thereof. It may be that considerations of public benefit and convenience, if brought to the attention of the state railway commission, may dictate an approval of the present service or a modification of the service as directed by the decree of the district court. With these questions this court cannot be concerned, since they are administrative in their nature, and not judicial. The affirmance of the decree of the district court necessarily must leave these matters open for such action as may be taken by the commission upon proper application being made, and is without effect upon its discretion in the matter. In all other respects, the decree of the district court is affirmed. The costs of this appeal will be taxed to the defendant.

AFFIRMED AS MODIFIED.

HAMER, J., concurring in part, and dissenting in part. (Filed July 3, 1914.)

Henry Herpolsheimer is alleged to be the owner of a large store building on certain lots in Lincoln at the intersection of N and Twelfth streets. The building is used for general merchandise purposes. It is said that the Herpolsheimer Company has occupied this store building for several years, conducting a general merchandise business, and that there is kept therein a large stock of goods, amounting in value perhaps to more than $100,000. Henry Herpolsheimer became a stockholder in the Citizens Railway Company. He subscribed to ten shares of the stock and paid $1,000 for the same. In the petition it is alleged that, in consideration of the taking of said stock by said Herpolsheimer, and certain other considerations, the officers and promoters of the said Citizens Railway Company assured the said Herpolsheimer "that there would be no change in the operation of cars over said Twelfth street from the intersection of N and Twelfth streets to and from said College View, or in the operation of cars over said Loop No. 1."

It appears that the Citizens Railway Company owned and operated lines of street railway in the city of Lincoln extending outside of the corporate limits of the city. It built "Loop No. 1," which extends from the intersection of N and Twelfth streets two blocks north to the intersection of Twelfth and P streets, and thence a block west to Eleventh street, and thence south along Eleventh street to N street, and thence east on N street to the intersection of Twelfth street; then a line from the intersection of N and Twelfth streets along N street to Twenty-ninth street; and then one line along Twelfth street from N street to South street, and thence east on South street to Twenty-sixth street. The Lincoln Traction Company owned and operated other lines of street railway extending beyond the corporate limits of the city. In 1909 there seems to have been a consolidation of the railroad properties of Lincoln. There were three corporations, the Lincoln Trac-

tion Company, the Citizens Railway Company, and the corporation known as the Citizens Interurban Railway Company. The Citizens Interurban Railway Company built a road from College View to the intersection of Twenty-sixth and South streets. The Citizens Railway Company operated its cars over the line of the Citizens Interurban Railway Company from College View to the intersection of Twenty-sixth and South streets. Before the commencement of this action the Citizens Railway Company had operated its cars over this line into the city of Lincoln over South and Twelfth streets. After the consolidation of the street railways the Lincoln Traction Company, which took over the other properties, abandoned parts of the said line operated by the Citizens Railway Company. Then the plaintiff began this action in the district court for Lancaster county to enjoin the defendant "from ceasing to operate a line of street cars around said Loop No. 1 and over said Twelfth street to South street, and thence east to Twenty-sixth street, and thence over said 'High Line' to the village of College View, and back and around said Loop No. 1," and from "abandoning any of the lines of street cars and street car service which were owned and operated by said Citizens Company prior to the said alleged consolidation; that they may be required forthwith to operate said line of street cars from the intersection of N and Twelfth streets south on Twelfth street to South street, and thence east on South street to Twenty-sixth street, and thence over said 'High Line' to College View and back, and to give the same street car service that there was over said line on Twelfth street and to said village of College View and back that was given prior to said alleged consolidation; that defendant may be required to restore the street car service on all the lines which it has abandoned; and that it may be required to operate all of its cars around said Loop No. 1, and give the same service on said cars that was given and afforded by said Citizens Company prior to said alleged consolidation."

Certain citizens claim to be interested in the Twelfth street line. There also appears to have been a Public Serv-

ice League of Lincoln. There was a community of interest on the Twelfth street line. The trial court enjoined the defendant "from abandoning Loop No. 1 as herein described, and from abandoning the South Twelfth street line from Twelfth and N streets to South street, and thence east on South Street to Twenty-sixth street, and from abandoning any of the lines formerly operated by the Citizens Railway Company now operated around Loop No. 1, and from changing the routing of the cars of said lines from the route over which they are now operated, and especially from routing any of said lines so as to remove the same from said Loop No. 1;" and "that the defendant do forthwith restore and operate the line of street cars from the intersection of N and Twelfth streets south on Twelfth street to South street, and thence east on South street to Twenty-sixth street, and thence over said 'High Line' to College View and back, and give the same street car service over the South Twelfth street line and 'High Line' to said village of College View and back that was given by the Citizens Company over said lines prior to the consolidation."

The *contract* not to change the operation of cars over said Twelfth street from the intersection of N and Twelfth street to and from said College View is urged as one of the reasons for enjoining the defendant.

It is claimed by the defendant that the plaintiffs are not entitled to an injunction because of the fact that the state railway commission has exclusive jurisdiction. This necessitates an examination into the powers of the state railway commission.

The constitutional amendment of 1906 reads: "The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision." Const., art. V, sec. 19a. Under this section a statute was enacted which provides: "The commission shall have the power to regulate the rates and ser-

vices of, and to exercise a general control over all railroads, express companies, car companies, sleeping car companies, freight and freight line companies, and all other common carriers engaged in the transportation of freight or passengers within the state." Rev. St. 1913, sec. 6107.

In the majority opinion it is said that the building and operation of a street railway line through the city affects the values of property in the vicinity of the line, and that it also affects the financial interests of the citizens. The opinion says: "It is alleged that the principal stockholders and officers of the defendant railway company are largely interested in property and different lines of business in the city, and that the proposed changes of the routing of the street cars, and other proposed changes in the service, are for the benefit and the interests of those officers and directors, and not in the interest nor for the benefit of the public at large, and that such change would be highly injurious to the property and business of these plaintiffs, as well as to the value of the property and the interests of the interveners who reside upon, or in the vicinity of, the Twelfth street line." The fact above stated is probably true. It is also said in the opinion that such changes should be made in the interest of the public, and that "the economy and efficiency of the service, and the interests of the citizens whose property rights and convenience are especially affected, should all be considered." The above statement is followed by an expression of the view that "contracts between individuals and public service companies which are for their benefit alone should also be considered, so far as these contracts do not interfere with the superior rights of the general public. There is no doubt that such matters are within the purview of the constitutional provision and the statute above quoted, which provide that the state railway commission shall have power to regulate the service and control common carriers of passengers." The thing proper to do is to search the constitutional provision above mentioned and the statutes for evidence of the thing alleged in the opinion. The constitution provides for the regulation of *rates,* service and

general control of common carriers. The use of the words "rates" would not include the routing of cars or the maintenance of a line of road. An examination of the statute shows that the legislature provided that the commission "shall have the power to regulate the rates and services of, and to exercise a general control over all railroads," etc. Rev. St. 1913, sec. 6107. It is difficult to understand how the establishing of rates would determine where the cars were to be run. The control over railroads is to be a "general control." Before the commission has power to control the details of the operation of a street railway, or of any other corporation of like character, there should be specific authority conferred by the constitution, and under such provision in the constitution there should be legislation directly authorizing the thing to be done which is attempted to be done.

But the opinion becomes more harsh as it proceeds. It says: "It appears that changes of this kind have been made by the street railway company, and that such changes have been by the company reported to the state railway commission from time to time, but it does not appear that these changes were authorized by the state railway commission, nor that any application has been made to that commission for authority to make such changes. The power to regulate rates of common carriers would be incomplete and comparatively useless without the corresponding power to regulate the service, and control the common carrier in performing such service, and these powers are expressly given to the state railway commission by the terms of the constitution, and the statute enacted thereunder. It seems clear that these provisions prevent the defendant from making such changes in the service without first obtaining the authority of the state railway commission so to do." According to this opinion, no initiative can be exercised by business men desiring to construct a street railway and to operate it, or a railroad, until there is first an application made to the railway commission. It is put at the gate to stand as a guard against the exercise of all enterprise. There is certainly nothing

wrong with the exercise of power to establish *rates*; but it seems very wrong to say that the *business* shall not be determined upon and the railway shall *not be constructed* unless the railway commission says so.   More than that, it is *against public policy*.   What right have we to create an institution that shall determine the business we engage in?   The power to *prevent discrimination,* the power to establish *rates,* is one thing; but the power to determine the *construction* of a railway company is entirely a different power.   There should be some freedom of action.   The legislature is the representative of the people.   It is established, among other things, for the purpose of defining legal rights, and outlining the direction in which business may be transacted; but it is not created for the purpose of constructing an image before which the citizen shall be compelled to fall down and worship before he engages in business.   In the zeal to regulate the action of American railway builders and street railway builders, the legislature has clearly overstepped the proper bounds if it can do the thing which is here sought to be done.   I concur in the right of the legislature to control and regulate *rates,* and it should be permitted to have a "general control," if such control is restricted; but here, according to the opinion, there is a sort of unlicensed autocracy given to this board which men would hesitate to give to kings and parliaments.

Mr. Herpolsheimer had the power to draw a contract with the gentlemen who told him they were going to build the street railway, and he should have done so if he wished protection.   He should have said to these men, "before I pay you $1,000 for the stock, I want your guaranty that you will operate the street railway in the way that you say you will.   I want to know that my $1,000 is measurably safe."   He might have taken a bond, as men do in other business.   He knew that the gentlemen who proposed to construct the street railway were going to operate it in the street, and that there might be *divergent* interests that would pull the line in some *other* direction, or that would result in the routing of a disproportionate share of the

cars on some other line.   Unless he was willing to take chances on the $1,000 as a voluntary subscriber, he should have employed his lawyer to draw up the proper contract. If this had been done, it would have been done in any event at the risk of a change being made to provide for the superior wants and necessities of the public.   The public is never to be lost sight of, and the roads are to be maintained for its benefit.   The most that Mr. Herpolsheimer would have been able to obtain, if the contract had been disregarded, would perhaps be damages.   This, however, is in the field of speculation, and a mere dictum.

The power exercised by the state railway commission is threefold.   It is legislative, administrative, and, within proper limits, it is judicial.   It is only judicial, however, over those matters specifically authorized.   If the regulation of rates or the operation of the line is an. *administrative* exercise of duty, then how is an appeal to be taken from this *administrative board* on this *administrative question* to a *judicial body* that does not have any administrative power whatever?   I am ready to be informed.   There is great danger, first, of an *iron rule* which makes the repository of power a sort of despot; second, there is such a thing as the court arrogating to itself the exercise of legislative and administrative power.   The creation of this railway commission is something that should be carefully guarded.   It should not be allowed to be a tyrant and to put its foot upon our necks.

If, as a matter of fact, the state railway commission has jurisdiction to regulate the management of the street railway, and perhaps it has, then it should exercise such control as the law gives it; but the *supreme court* of the state should not be made the manager of a street railway company by *an appeal from the railway commission.*

Section 6109, Rev. St. 1913, provides that the commission shall have the power, and it shall be its duty, to make necessary classifications, necessary rates and charges, to regulate freight and passenger tariffs, to correct abuses, to prevent unjust discriminations, extortions and overcharges in *rates* and passenger *tariffs*.   But there is noth-

ing anywhere in the act which authorizes the determination by the commission of whether a street car shall run on one line or another.

Section 6111, Rev. St. 1913, authorizes the commission to fix different rates for different railroads and for different lines under the same management, or for different parts of the same line, but there is nothing said about taking the cars from one line and putting them on another. To the mind of the writer the opinion of the majority justifies an intervention of private rights, and destroys the initiative of the persons who run the street railway company, and is without regard to the interests of the public. It is simply a mistake.

It is provided by section 6137, Rev. St. 1913, that any person "complaining of anything done or omitted to be done by any railway company or common carrier, subject to the provisions of this article, or any of the laws of this state, relative to the control and regulation" of such common carriers, may apply to the commission, briefly stating the fact, and thereupon a copy of the complaint shall be served on the carrier, "who shall be required to satisfy the complaint, or file a written answer thereto within a reasonable time." It is further provided that "whenever the commission has reason to believe that any railway company or common carrier is violating any provisions of this article, or any laws of this state relative to the control and regulation of railway companies or common carriers, it shall at once institute an inquiry and fix a time and place for hearing thereon." It will be noticed that the fact that a complaint is made is the basis of the jurisdiction to hear the case. Until a complaint is made there is no jurisdiction. The section does not look to such a proceeding as this. This proceeding in this case is entirely outside of the contemplation of the section referred to, and it is outside of the act. The idea of the section and of the statute is that the regulation shall apply to a service which is *already created* by the carrier, and which is supposed to be not suitable for the public convenience and safety. The theory is that upon an investigation such an order will be

made as will make the service suitable. The thing attempted to be done is beyond and outside of the statute.

Mr. Herpolsheimer put himself in the hands of the state railway commission if that body has jurisdiction. He did not put himself in the hands of the Nebraska supreme court, because that has no authority to review matters that are administrative or legislative. No appeal can be taken from the legislature to the supreme court. No appeal can be taken from the action of the governor to the supreme court. The supreme court of Nebraska is a limited body, and it will have enough to do if it stays within judicial lines and discharges its duty where the constitution and the statutes have provided that it may work.

I do not think that the effect of this new constitutional and legislative provision is yet understood. It will require the experience of the people, the common carriers, and the commission, as well as the time and labor of the courts, to develop and formulate a system that will be satisfactory in the main to all concerned. There should probably be further investigation and a further effort now. I hope that the protest which I here record will result in a careful consideration of the powers conferred, and in an opinion of this court elaborately setting forth that which may properly be done.