CONSUMERS COAL COMPANY ET AL., APPELLANTS, V. CITY OF LINCOLN ET AL., APPELLEES.

FILED JULY 19, 1922.   No. 22549.

1. **Municipal Corporations: CHARTERS.** By section 2, art. XIa of the Constitution, power is conferred upon the electorate of a city to frame a charter for its own government as fully and completely as the electorate of the state may form a state Constitution, subject only to the limitations contained in said section that said charter shall be "consistent with and subject to the Constitution and laws of this state."

2. ———: ———. The purpose of the constitutional provision is to render cities independent of state legislation as to all subjects which are of strictly municipal concern; therefore, as to such matters general laws applicable to cities yield to the charter.

3. ———: ———: POWERS. It is within the competency of the electorate of a city to adopt a charter in any form it may deem proper within the limits specified in the Constitution; it may take the form of a grant or a limitation of powers; in the former case all powers not expressly or impliedly granted to the city government are reserved to the people; in the latter all powers are granted to the city government except those expressly or impliedly withheld.

4. ———: ———: ———. The home rule charter adopted by the

Consumers Coal Co. v. City of Lincoln.

city of Lincoln is a grant as distinguished from a limitation of power.

5. ——: ——: Construction. The rules of construction of a charter adopted under the constitutional provision are determined by the form of its enactment, and those rules applied which are suited to the particular instrument.

6. ——: ——: ——. Being a grant of power, the Lincoln charter is to be construed according to the same rules as a legislative act containing the same provisions, in determining what authority is thereby granted the city government.

7. ——: ——: ——. The provision of the Lincoln charter that "the council shall have, possess and exercise * * * all the * * * legislative * * * powers and duties" does not confer legislative authority beyond that necessary to the exercise of the powers specially enumerated in the charter. Its meaning is merely that such powers as are granted shall be exercised by the council.

8. ——: ——: Powers. Where a certain power is conferred upon a municipality and the method of its exercise is prescribed, such method constitutes the measure of the power.

9. ——: ——: ——. The power conferred by the Lincoln charter "to purchase, construct and otherwise acquire, own and operate gas and electric plants and properties for the manufacture and distribution of gas, heat and electricity for the purpose of supplying the city and the inhabitants thereof with such service and utilities," does not include by implication authority to the council to establish and maintain a fuel yard, for the purchase and sale of fuel at retail to such inhabitants, in competition with private enterprises. Ordinance to that end declared invalid.

10. ——: Taxation: Municipal Fuel Yard. The maintenance of a municipal fuel yard for the purpose of selling fuel to the inhabitants of the city is a "public purpose" for which money raised by taxation may be used.

Appeal from the district court for Lancaster county: Elliott J. Clements, Judge. *Reversed, with directions.*

*Field, Ricketts & Ricketts,* for appellants.

*C. Petrus Peterson* and *Charles R. Wilke, contra.*

Heard before Morrissey, C. J., Rose, Aldrich and Flansburg, JJ., Redick, District Judge.

REDICK, District Judge.

This action is brought to enjoin the city of Lincoln from maintaining and operating a public market for the purchase and sale of coal and wood, and the allegations of the petition are substantially as follows: After stating the municipal character of the defendant as a city of the first class, and the official character of the other defendants as mayor and council thereof, it is alleged that on the 15th day of August, 1921, the mayor and council of said city duly passed an ordinance providing for the organization and operation of a fuel yard consisting of wood and coal, to be conducted under the management and control of the city for the purpose of purchasing coal and wood at remote points of supply, having it shipped to the city of Lincoln and sold at retail to the inhabitants thereof; that there was no actual or threatened shortage in the supply of fuel, nor was there any necessity or emergency which demanded that the city of Lincoln should engage in the retail fuel business; that said business is being conducted by the use of public moneys raised by taxation, and that the defendant city threatens to continue said business permanently. The plaintiffs are engaged in the retail fuel business and other merchandising in the city of Lincoln, and on that account and as taxpayers bring this action.

The claim of the plaintiffs is that there is no authority of law permitting the city of Lincoln as a municipal corporation to establish a coal and wood-yard, and that the ordinance purporting to do so is *ultra vires*. The defendants separately demurred to the petition, which demurrers were sustained, and the plaintiffs refusing to amend, but electing to stand on the petition, the case was dismissed and is now here on appeal by the plaintiffs alleging error in sustaining the demurrers.

Two questions are submitted for decision: First. Is the establishment and operation of a municipal coal and wood yard for the sale of those commodities at retail to the inhabitants of the city a public use for which tax money may be employed? Second. Has the city council

of the city of Lincoln power to establish a municipal coal and wood-yard under a legislative act or under its charter as adopted under section 2, art. XIa of the Constitution?

The first question has been answered both ways: In the affirmative are the cases of *Laughlin v. City of Portland,* 111 Me. 486, and *Jones v. City of Portland,* 113 Me. 123, affirmed on appeal, 245 U. S. 217. These cases all involve the validity of the same statute expressly granting to the city of Portland the power to establish a permanent wood, coal and fuel-yard. *Holton v. City of Camilla,* 134 Ga. 560. See, also, *Central Lumber Co. v. City of Waseca,* 188 N. W. (Minn.) 275, following the Maine cases. In the negative are: *Opinion of Justices,* 150 Mass. 592, and *Opinions of Justices,* 155 Mass. 598, and *Baker v. City of Grand Rapids,* 142 Mich. 687, in which the Massachusetts cases were followed. In these cases, however, it was held that for the relief of the poor and in cases of emergency, while it lasted, the city could purchase and sell to its citizens who could not otherwise procure the same. Upon the same principles it is held that the manufacture and sale of ice is not a public purpose. *Union Ice & Coal Co. v. Town of Ruston,* 135 La. 898; *State v. Orear,* 277 Mo. 303; *State v. Port of Seattle,* 104 Wash. 634.

Metropolitan cities in this state have been granted the power to maintain municipal coal yards (Laws 1917, ch. 87, sec. 4½), thus establishing the legislative view that it is for a public purpose, and while the final determination of that question is for the courts, the legislative expression upon the subject is of great weight. This principle and a consideration of the cases above cited lead us to adopt the reasoning in those cases which hold that a tax imposed to support a municipal fuel-yard is for a public purpose, and not contrary to any limitation on the taxing power.

The determination of the second question requires the construction of the constitutional provision permitting cities to form their own charters, the charter so formed

by the city of Lincoln, and the legislation upon the particular subject under discussion.

We are requested by appellees in their brief "to state clearly and definitely the effect of the home rule charter provisions of our own Constitution," and "the effect of the action of the electorate of the city of Lincoln in using in its charter the provision for vesting all legislative power in the council." We shall attempt to do this in so far as it is found necessary for the disposition of this case; to exceed that limit, though the temptation is most alluring, would unduly extend this opinion.

Let us first set out the provisions and enactments to be construed: Section 2, art. XIa of the Constitution is as follows: "Any city having a population of more than five thousand (5,000) inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and Laws of this state." Then follow provisions for ratification by the electors, and that 60 days thereafter it shall "become the charter of said city, and supersede any existing charter and all amendments thereof."

We have recently held in *Schroeder v. Zehrung*, 108 Neb. 573, that "a city may enact and put into such charter any provisions for its government that it deems proper, so long as they do not run contrary to the Constitution or any general statute."

The charter ordained by the city of Lincoln under the above authority consists of an adoption of the legislative charter then existing, with a few merely verbal changes, and contains the following:

"Art. II, sec. 1. Without denial or disparagement of other powers, held under the Constitution and Laws of the state, the city of Lincoln shall have the right and power:"

"13. Inspection of Weights, Hay, etc. To provide for the inspection and weighing of hay and grain, and coal, the measuring of wood and fuel to be used in the city, and to determine the place or places of the same, and to regu-

late and prescribe the place or places of exposing for sale hay, coal and wood."

"50.  General Welfare.  To make all such ordinances, by-laws, rules and regulations not inconsistent with the laws of the state as may be expedient, in addition to the special powers in this article enumerated, maintain the peace, good government, and welfare of the city, its trade, commerce and manufactures."

"Art. IV, sec. 8.  The council shall have, possess and exercise, by itself or through such methods as it may provide, all the executive, legislative and judicial powers and duties."

"Art. VIII, sec. 11.  The city shall have power to purchase, construct and otherwise acquire, own and operate gas and electric plants and properties for the manufacture and distribution of gas, heat and electricity for the purpose of supplying the city and the inhabitants thereof with such service and utilities; and to purchase, lease, construct or otherwise acquire, own and operate street railways and telephone plants, lines and systems, and any and *all other public service plants and properties,* for the purpose of supplying the city and the inhabitants thereof with *such service and public utilities.*"

Section 5195, Rev. St. 1913, provides:  "Any city of the first * * * class * * * shall have the power and is hereby authorized to establish and maintain a heating or lighting system for such city."

What then is the nature and extent of the power granted by the Constitution?  Without doubt it invested the electorate of the city within the corporate limits with all the powers possessed by the electorate of the state consistent with and subject always to the Constitution and Laws of the state; but necessarily with the restriction that such powers might be exercised only "for its own government," *i. e.,* in matters appertaining to municipal affairs. Within the limitations and restrictions stated, the city has been well said by Justice Brewer to be "an *imperium in imperio.*  Its powers are self-appointed and the reserved

control existing in the general assembly does not take away this peculiar feature of its charter." *St. Louis v. Western Union Telegraph Co.*, 149 U. S. 465. It must be borne in mind, however, that what *may* be done does not foreclose the question of what *has* been done.

Appellant cites *State v. Missouri & Kansas Telephone Co.*, 189 Mo. 83. The Constitution of the state of Missouri permits a city to "form a charter for its own government, consistent with and subject to the Constitution and Laws of this state"—language identical with our own—and in discussing the nature of the power so granted, Valliant, J., said (p. 99) :

"A charter framed under that clause of the Constitution within the limits therein contemplated has the force and effect equal to one granted by an act of the legislature. But it is not every power that may be essayed to be conferred on the city by such a charter that is of the same force and effect as if it were conferred by an act of the general assembly, because the Constitution does not confer on the city the right, in framing its charter, to assume all the powers that the state may exercise within the city limits, but only powers incident to its municipality; yet the legislature may, if it should see fit, confer on the city powers not necessary or incident to the city government. There are governmental powers the just exercise of which is essential to the happiness and well being of the people of a particular city, yet which are not of a character essentially appertaining to the city government. Such powers the state may reserve to be exercised by itself, or it may delegate them to the city, but until so delegated they are reserved. The words in the Constitution, 'may frame a charter for its own government,' mean may frame a charter for the government of itself as a city, including all that is necessary or incident to the government of the municipality, but not all the power that the state has for the protection of the rights and regulation of the duties of the inhabitants in the city, as between themselves."

We approve this concept of the nature of the charter.

While the power to form a charter may be likened to the power of the people to form a Constitution, the subjects over which it may be exercised are confined to those matters appertaining to city government. In the · · · just cited the charter attempted to authorize the city to "regulate prices to be charged by telephone * * * companies," which was held to be not within the power of the city electorate to do. In a concurring opinion Marshall, J., remarked:

"I am thoroughly persuaded that it never was within the contemplation of the framers of our system of government, or of our Constitution, that any city, whether organized under the general laws of this state, or under the provisions of the Constitution which allow cities to frame their own charter, to confer upon cities anything more than a *police power, and a strictly municipal power.* And that the power to enact all laws of civil conduct, and to prescribe all civil remedies among citizens, in short, to enact laws as distinguished from municipal regulations, is expressly reserved to the legislature of this state, and cannot be delegated by it."

It is not easy in all cases to distinguish between municipal powers and state powers, and when they come within the classification of police powers, they are as impossible of accurate definition as the police power itself, which Judge Cooley, in his work on Constitutional Limitations, characterized as (I quote from memory) "That bastard power to which is referred for justification every infraction of the liberties of the people." We must therefore content ourselves with the consideration of each case as it arises, applying those principles which precedent and logic approve.

Let us not be misunderstood. We hold that the city may by its charter under the Constitution provide for the exercise by the council of every power connected with the proper and efficient government of the municipality, including those powers so connected, which might lawfully be delegated to it by the legislature, without waiting for

such delegation. It may provide for the exercise of power on subjects, connected with municipal concerns, which are also proper for state legislation, but upon which the state has not spoken, *until* it speaks. *City of Spokane v. Spokane & I. E. R. Co.*, 75 Wash. 651. Its position in this regard being analogous to that of the state with reference to matters of national cognizance, *e. g.*, regulation of commerce.

Interesting in this connection is the case of *Grant v. Berrisford*, 94 Minn. 45, where it was held that a provision of a charter framed by the people omitting the statutory requirement of 90 days' notice to the owner before suit might be brought by a materialman upon the contractor's bond for the performance of a contract with the municipality was valid, the court saying:

"The sole reason urged by defendants in support of their demurrer is that the provision of the general law requiring notice of the nature and amount of the claims of the beneficiaries of the bond to be given within ninety days after the last item of labor or material is applicable to the city of St. Paul, notwithstanding its charter provisions. This presents the question whether the charter provisions relating to contractors' bonds are in harmony with and subject to the Constitution and Laws of the state, as required by constitutional amendment. If this limitation on the power of cities in framing their charters is to be construed as prohibiting the adoption of any charter provisions relating to proper subjects of municipal legislation and matters germane thereto, unless they are similar to and contain all the provisions of the general laws on the subject, then, as said by the learned trial judge: 'All that the framers of a charter can do, where there is a law in existence at the time the charter is adopted, is to add such provisions as are not already contained in the law, and are not repugnant to it. If this is the extent of the power conferred upon cities to make their own charters, then the constitutional grant is a mere form of words, of no practical value.' It is clear that

such is not a proper construction of the limitation. This limitation forbids the adoption of any charter provisions contrary to the public policy of the state, as declared by general laws, or to its penal code—for example, provisions providing for the licensing of prize fighting or gambling or prostitution, or those which are subversive of the declared policy of the state as to the sale of intoxicating liquor. But it does not forbid the adoption of charter provisions as to any subject appropriate to the orderly conduct of municipal affairs, although they may differ in details from those of existing general laws. This is necessarily so, for otherwise effect could not be given to the constitutional amendment which fairly implied that the charter adopted by the citizens of a city may embrace all appropriate subjects of municipal legislation, and constitute an effective municipal code, of equal force as a charter granted by a direct act of the legislature."

It will be noticed that both the statute and the charter dealt with bonds given by the contractor to the municipality, and the holding was that, the matter being a proper subject of municipal legislation, the charter superseded the statute. Had the charter assumed to cover bonds other than those given to the city, it must have been declared invalid.

Counsel on both sides of this case cite 1 Dillon, Municipal Corporations (5th ed.) sec. 63, as follows:

"The act of the city in formulating the charter and determining the provisions to be included therein has the same force and authority as a charter with the same provisions enacted by the legislature that is not restrained by any constitutional limitations. * * * The power and authority conferred by the Constitution upon cities to frame their own charters extend to all subjects and matters properly belonging to the government of municipalities, and this necessarily includes any subject appropriate to the orderly conduct of municipal affairs."

Appellees therefrom argue: "Assuming that the electorate of the city had expressly authorized the city council

to establish a municipal coal-yard, such action would clearly be the equivalent to a legislative act. This definitely establishes that the power is vested in the city of Lincoln to establish a municipal coal-yard without state legislation. To hold otherwise would be to destroy the basic purpose of the home rule charter provision of the Constitution."

Assuming the public purpose and with the interpellation for clarity of the words "electorate of the" just before "city of Lincoln," we agree. And just at this point of the discussion we wish to observe that it appears to us that appellees' counsel fails to differentiate between the powers conferred upon the electorate of the city in the formation of a charter, and powers of the city council under that charter. He quotes section 1, art. III of the Constitution, "The legislative authority of the state shall be vested in a legislature," and section 8, art. IV of the city charter, "The council shall have, possess and exercise, by itself or through such methods as it may provide, *all the executive,* legislative and judicial powers and duties," and argues that because the state Constitution is a limitation of power, and that, subject only to those limitations, the power of the legislature is supreme, so under a city charter adopted by the same sovereign people, reposing all legislative power in the council, such power is unlimited except where controlled by the Constitution and Laws of the state. The argument assumes that the charter so formed is a limitation, as distinguished from a grant of power. In this appellees are in error, not perhaps on general principles, but upon the proper construction of the two instruments under comparison.

Counsel concedes that a legislative charter is a grant, but contends that, by the adoption of a charter in substantially the same form and words of a legislative charter, the people have, by some process of electoral legerdemain, transformed it into a limitation. He says: "There is a fundamental difference between a city charter resting on constitutional authority directly, on one hand, and

legislative authority on the other." Of what this funda-
mental difference consists is not divulged. He cites *State
v. Otis,* 98 Ohio St. 83. In that case the city of Cleveland
had adopted its own charter under constitutional author-
ity. Section 1, among other powers enumerated, expressly
reserved to the city of Cleveland "all powers that now
are, or hereafter may be, granted to municipalities by the
Constitution or Laws of Ohio," and section 2 declared:
"The enumeration of particular powers by this charter
shall not be held or deemed to be exclusive." Later the
legislature passed an act conferring power upon munici-
palities to provide for appointment of a board of rapid
transit commissioners, and the question was whether the
city of Cleveland had such power as it was not expressly
conferred by the charter, and it was held: "Under the
provisions of sections 1 and 2 of the charter of the city
of Cleveland, authority is reserved to that city to exercise
any power now or that may hereafter be conferred upon
the municipalities of this state by the laws of Ohio."

In the opinion the court used this language: "In other
words, these declarations at the very threshold of the
charter provisions clearly indicate that it was not the in-
tention of the people of the city of Cleveland when they
adopted this charter to deprive that city of any power
conferred upon municipalities by the statutes of this state,
*or that might under the Constitution and laws of the state
of Ohio have been written into the charter itself."*

The italics are counsel's, and great stress is laid upon
the words italicized, from which he concludes that "the
enumeration is not requisite as a condition precedent to its
exercise" (the power). But is the converse of the proposi-
tion laid down by the court true, that it was the intention
of the people to *confer upon the city* government all the
power of the electorate, notwithstanding the enumeration?
We think not; but it is not necessary to decide the point
first, because the court is speaking of the powers of the
city in forming a charter (moreover, the alternative in
italics is *obiter dictum,* the only question being whether

the city could exercise a power expressly granted by law under the explicit reservation of the charter) ; and, second, by reason of the difference of charter provisions from those under discussion.

*Park v. City of Duluth,* 134 Minn. 296, is cited also. There the charter framed by the electorate did not confer power upon the city to impose a wheelage tax, but under prior legislative act it had such right. The charter provided that the city should "have and exercise all powers, functions, rights and privileges possessed by the city of Duluth prior to the adoption of this charter, * * * and * * * it shall have all the powers, and be subject to the restrictions contained in this charter," and it was held: "This continues all power not inconsistent with the terms of the new charter, and continued the power to impose a vehicle tax." Attention is called to the following excerpt from the opinion:

"The people of a city in adopting a charter have not power to legislate upon all subjects, but as to matters of municipal concern they have all the legislative power possessed by the legislature of the state, save as such power is expressly or impliedly withheld."

We do not doubt the correctness of this statement of the law, but it will be noted that the court speaks of "the people of a city in adopting a charter." It does not deal with the powers of the city council under that charter, which, we conceive, is an entirely different matter.

Neither of these cases support the contention that a charter adopted by the electors of a city is a limitation rather than a grant of power. In *Baggage and Omnibus Transfer Co. v. City of Portland,* 84 Or. 343, it was expressly held: "A state constitution is a limitation and not a grant of power," and "a municipal charter is a grant and not a limitation of power, hence authority to enact an ordinance must be found in the charter expressly or by necessary implication." Appellee suggests that the charter in question was not a home rule charter for the reason that the city "was operating under a legislative char-

ter" which had never been superseded by a home rule charter. The facts are: It was provided by the Constitution: "The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon." The city did not formally "enact" its charter, but amended it a number of times. The precise status of the charter in question, in view of the prohibition to the assembly and the grant to the city, is a puzzling problem; a reasonable view would seem to be, perhaps, that the constitutional provisions, *ex proprio vigore,* changed the existing legislative to a home rule charter, or, at least, that by amending the legislative charter the city had recognized and enacted it as the latter. But in the view we take of the charter under review, we may leave the riddle unguessed. See, however, on this point: *Portland v. Parker,* 69 Or. 271; *City of Covington v. District of Highlands,* 113 Ky. 612.

Such a charter has been aptly termed the Constitution of the city (dissenting opinion of Wanamaker, J., in *State v. Otis, supra*) ; and Constitutions may be either grants or limitations. It is familiar law that the Constitution of the United States is a grant of power, while that of Nebraska and most or all of the states are limitations of power, the distinction being clearly stated in Cooley, Constitutional Limitations (4th ed.) p. 210, quoted in *State v. Moore,* 40 Neb. 854, as follows:

"When a law of congress is assailed as void, we look into the national Constitution to see if the grant of specific powers is broad enough to embrace it; but when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States, or of the state, we are unable to discover that it is prohibited. We look in the Constitution of the United States for *grants* of legislative power, but in the Constitution of the state

to ascertain if any *limitations* have been imposed upon the complete powers with which the legislative department of the state is vested in its creation. Congress can pass no laws but such as the Constitution authorizes either expressly or by clear implication, while the state legislature has jurisdiction of all subjects on which its legislation is not prohibited. The law-making power of the state recognizes no restraints, and is bound by none, except such as are imposed by the Constitution. That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is, therefore, the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations, the power to make laws would be absolute."

The distinction is founded on the different forms of the respective instruments. At the time of the adoption of the federal Constitution the people of the states were jealous of surrendering any portion of their sovereign power to a new government, and so the powers were specifically granted. But in adopting constitutions for their own government, where the powers were to be exercised by their own people, they pursued a more liberal policy, and all power except that which was expressly withheld was conferred upon the state government.

Constitutions and statutes are but different forms of legislation, the one being enacted by the people themselves, the other by their representatives, the former differing from the latter only in its paramount force in cases of conflict. *Dailey v. Swope*, 47 Miss. 367; *Willis v. Mabon*, 48 Minn. 140.

That a charter framed by the people of a city has the force and effect of one granted by an act of the legislature is held in *State v. Missouri & Kansas Telephone Co.*, 189 Mo. 83.

"A charter framed by a city for itself under the constitutional provision has, within the limits therein contemplated, the force and effect of one granted by an act of the

legislature, when unrestrained by constitutional provision, and by express provision it supersedes the old charter and all amendments thereto. Provisions of the freeholders charter which are purely municipal in their character supersede provisions of the general laws which are inconsistent therewith." 1 Dillon, Municipal Corporations (5th ed.) sec. 63.

We are unable to perceive any logical ground for distinguishing between a charter of a city adopted by the people and one enacted by the legislature based merely upon the origin of the legislation. That they had the power to adopt either kind of a charter is conceded. The legislative act is universally held to be a grant of power, and, if the charter adopted is also a grant of power, then the same principles of construction must be applicable in determining what powers are thereby granted to the city.

No doubt it was within the competency of the electorate of the city of Lincoln to adopt a charter which under settled principles of construction would be a limitation as distinguished from a grant of power; but, as appellee contends: "The vital question here is: What did the people of the city of Lincoln do with the sovereignty acquired by the adoption of a home rule charter?" or, rather, what did they do with the sovereignty conferred by the Constitution by the adoption of a home rule charter? Did they grant to the city council unlimited power to legislate upon municipal affairs in the same sense that the Constitution granted them to the legislature, or did they limit such power to the subjects enumerated in the charter? Counsel argue: "If when the electorate of the state by the fundamental law of the state say, 'The legislative authority of the state shall be vested in a legislature consisting of a senate and house of representatives,' it follows that the legislature possesses the full legislative power subject to the limitations of the Constitution, why does not the same logic apply where the electorate of the city of Lincoln establish a representative body called the city council and say that the council 'shall have, possess and exercise * * *

all the * * * legislative * * * powers and duties?' If this language does not vest all the legislative power of the city in the council, what language can be used to effect that purpose?" This argument assumes that the Constitution and the charter are both limitations of power; that the Constitution is of that character is conceded; whether the charter is or not, as counsel concedes, "reference must of necessity be had to the particular home rule charter to determine its effect."

The two provisions of the charter relied upon to sustain appellees construction are:

"Art. II, sec. 1.  Without denial or disparagement of other powers held under the Constitution and laws of the state, the city of Lincoln shall have the right and power."

"Art. IV, sec. 8.  The council shall have, possess and exercise, by itself or through such methods as it may provide, all the executive, legislative and judicial powers and duties."

The charter must be construed, however, as a whole, and effect given to all its provisions, in determining its character.  Let us then take a general survey of its structure.

The prefatory synopsis which is required to be submitted with the charter commences:

"All that the charter convention has attempted to do, in drafting the city charter proposed herewith, is to submit to the voters the existing city charter without any substantial departure from its provisions. * * * It has been the endeavor * * * to draft a charter that will present to the voters solely the issue whether or not they desire a 'home rule' charter for the city.  To that end it has seemed desirable that no change be proposed at this time that could be used legitimately to confuse the issue sought to be presented."

Article I provides that the city shall be a body political and corporate—the city limits, etc.  Following article II, sec. 1, quoted above, are enumerated the general powers of the city in seven subsections.

"Section 2. In addition to the powers hereinbefore enumerated, the city shall have power by ordinance:" (Then follow 15 pages containing 49 specifications of subjects of municipal legislation and regulation, and section 50 is the general welfare clause already quoted; numerous other powers are specified in detail by later sections.) Articles III and IV have to do with elections and officers; article V, enactment of ordinances; article VI, water-works; article VII, contracts; article VIII, public improvements and utilities, containing section 11, above quoted; article IX, finance and taxation. Compare this document with the state Constitution, and we think it will be evident that they are no more alike in their basic characteristics than a liquor license is like a marriage license. The Constitution does not attempt to define the powers of the legislature, otherwise than by negativing its powers to enact local or special laws as to certain subjects; in other words, it does not *define,* but *limits;* and therefore it is held that the legislature possesses all power except 'as limited. How different the charter, which lays down with meticulous particularity what powers the council shall have; and when it granted to the council "all the legislative powers and duties," it merely designated what officers of the city should perform those legislative functions which the charter had granted to the city. To impart to this language any wider significance would render supererogatory fully three-fourths of the provisions of the charter, or require us to ignore them in determining its character and effect. The word "all" adds nothing to the extent of power granted, especially when taken in connection with the definite article "the." There would be more reason for a larger signification if it had read "all legislative power." What need of specifying the subjects upon which the council might legislate, if all subjects were to be within their cognizance? Why not incorporate the city and insert the provision under review and let it go at that? We agree with appellees "that the electorate may, in their discretion, grant full power to the

city council without enumeration," but have they done so? The logical inference from the plain reading of this charter is that the electorate were unwilling to grant unlimited power to the council, but intended it to exercise only the powers granted and such powers as are therefrom necessarily implied. Again, compare if you will this charter with the federal Constitution and the analogy is striking. By section 9, art. I of the latter, certain powers are conferred upon congress, and it is conceded by all that they are exclusive; that every federal enactment must find its justification in some express power contained in the Constitution, or implied as necessary to carry out the express power granted.

We conclude that the charter of the city of Lincoln falls within that class of "Constitutions" which are to be construed as grants rather than limitations of power; that the principles of construction applicable thereto are the same as to a grant by the legislature; and that the principles stated in 7 McQuillin, Municipal Corporations (Supp.) sec. 352, quoted in appellants' brief are as applicable to a charter adopted by the people in the form of the Lincoln charter as one granted by legislative act, to wit:

"A municipal corporation, therefore, possesses no powers or faculties not conferred upon it, either expressly or by fair implication, by the law which created it, or by other laws, constitutional or statutory, applicable to it. It is a creature of the law established for special purposes and its corporate acts must be authorized by its charter, or other laws applicable thereto. Every investigation, therefore, relating to its powers must be conducted from the standpoint of such laws. Wherefore the usual formula, invariably supported by judicial utterances and judgments, in substance, is: That a municipal corporation possesses and can exercise these powers only: (1) Those granted in express terms; (2) those necessarily or fairly implied in, or incident to, the powers expressly granted; and (3) those essential to the declared objects and pur-

poses of the municipality, not merely convenient, but indispensable."

The following cases support the view that we have adopted, that the home rule charter in the form of the one under review is a grant of power rather than a limitation: *St. Louis v. Western Union Telegraph Co.,* 149 U. S. 465; *State v. Otis,* 98 Ohio St. 83; *Park v. City of Duluth,* 134 Minn. 296.

It remains to be determined whether authority to establish and maintain a coal and wood-yard, as proposed by the ordinance of the defendant city, is conferred by the charter, either expressly or by necessary implication. Here again appellees confuse the powers of the city of Lincoln with the powers of the council. They say: "On the question, therefore, of the power in the city of Lincoln, under its home rule charter, there would seem to be no doubt that the power exists, and the question resolves itself in one of the methods of exercising the power." We have shown that the power does exist in the city (assuming the public purpose) as a segregated portion of the electorate, but has the city assumed that power, and conferred upon its agent, the city council, authority to exercise it? The only sections of the charter to which our attention has been called as justification for the ordinance in question are those quoted in the early part of this opinion. Section 1, art. II, in addition to the powers granted, reserves to the city "other powers held under the Constitution and Laws of the state." Therefore, if the power in question existed outside the charter, it is preserved. *State v. Otis,* and *Park v. City of Duluth, supra.* The only preexisting legislative expression upon this subject is found in section 5195, Rev. St. 1913, above quoted, and as it confers no further or additional power than section 11, art. VIII of the charter, it need not be further considered.

For convenience section 11 will be repeated: "Art. VIII, sec. 11. The city shall have power to purchase, construct and otherwise acquire, own and operate gas and electric

plants and properties for the manufacture and distribution of gas, heat and electricity for the purpose of supplying the city and the inhabitants thereof with such service and utilities; and to purchase, lease, construct or otherwise acquire, own and operate street railways and telephone plants, lines and systems, and any and all other public service plants and properties, for the purpose of supplying the city and the inhabitants thereof with such service and public utilities.".

It is argued that, inasmuch as the power is granted to furnish heat, the determination of the method or means of supplying it is delegated to the council by the general grant of legislative power, and the cases of *Jones v. City of Portland,* and *Laughlin v. City of Portland; supra,* are relied upon. As before stated, they both involve the same statute, and a consideration of the *Laughlin* case will suffice for our purpose.

"The legislature of Maine enacted the following law: 'Any city or town is hereby authorized and empowered to establish and maintain within its limits a permanent wood, coal and fuel-yard, for the purpose of selling, at cost, wood, coal and fuel to its inhabitants. The term "at cost" as used herein shall be construed as meaning without financial profit.' "

The question to be decided was stated to be: "The important question is therefore sharply raised, whether this court must declare unconstitutional this act of the legislature of 1903. It is not a question whether under the general statutory powers a municipality has the right to take this step, a question that has arisen in many cases, but whether such municipality can exercise the right when conferred upon it by the legislature in clear and unambiguous terms."

Having arrived at the conclusion that the furnishing of *heat* was a public purpose analogous to those of furnishing light and water, the court holds that the legislature "can do this by any appropriate means which it may think expedient," in the exercise of its absolute power,

except as limited by the Constitution. And the opinion proceeds:

"The vital and essential element is the character of the service rendered and not the means by which it is rendered. It seems illogical to hold that a municipality may relieve its citizens from the rigor of cold if it can reach them by pipes or wires placed under or above the highways but not if it can reach them by teams traveling along the identically same highway. It will be something of a task to convince the ordinarily intelligent citizen that an act of the legislature authorizing the former is constitutional but one authorizing the latter is unconstitutional beyond all rational doubt. For we must remember that we are considering the existence of the power in the legislature which is the only question before the court and not the wisdom of its exercise which is for the legislature alone."

This language was quoted with approval by the supreme court of the United States on appeal in *Jones v. City of Portland*, 245 U. S. 217, and the case affirmed, great emphasis being laid upon the view that the judgment of the highest court of the state upon what should be deemed a public use in a particular state is entitled to the highest respect, and would be accepted unless clearly not well founded, citing cases. In the Maine case we have established the power of the city to furnish heat as a public use, and a legislative prescription of the mode of doing it. Could it be logically claimed that under such authority the city might erect and maintain a central heating plant for distribution of heat through pipes? The argument is persuasive as applied to the situation there presented, which started with the power expressly granted. In this case we have to go back a step and determine whether it has been granted. Conceding the power granted to supply heat, the precise question is, may it be done in the manner proposed?

It is a well-established proposition in municipal law that, where a power is granted and the manner of its exer-

cise prescribed, the method is the measure of the power. *Page v. Belvin,* 88 Va. 985.

In *City of Ft. Scott, v. Eads Brokerage Co.,* 117 Fed. 51, it was held: "The prescription, by the statutes, under which a municipality is organized or acting, of the manner in which it shall exercise one of its powers, limits the right to exercise it to that method, and its use in any other way is *ultra vires* of the corporation, and void." And in *Putney Bros. Co. v. Milwaukee County,* 108 Wis. 554, it was held that a contract by the county for the private treatment of an inebriate at a Keeley Institute was not authorized as implied from its general power to provide for paupers and inebriates, the court saying: "Thus it appears that the legislature has provided certain methods by which inebriety or habitual drunkenness may be dealt with, and we think it plain that by prescribing certain methods it has excluded other methods, and that the general provisions requiring the county or town to care for and relieve paupers refer to the necessary food, clothing, ordinary medical treatment, and the like, and not to medical treatment looking toward the cure of inebriety as a disease."

In *Varney v. Justice,* 86 Ky. 596, it was held: "The words of the Constitution are never to be regarded as directory merely. If directions are given as to the manner of exercising a power, it was intended that the power should be exercised in the manner directed and in no other manner, as no unessential matters were intended to be embraced in the Constitution." This language is as applicable to a city constitution as to that of the state.

Further citation on this point is unnecessary, as the rule is well established. So we have to inquire whether or not the provisions of the charter prescribed the mode in which the power to furnish heat to the inhabitants of the city shall be exercised; and it seems to us clearly that the method is provided for by section 11, art. VIII of the charter, in the words "construct and otherwise acquire, own and operate gas and electric plants and properties

for the manufacture and distribution of gas, heat and electricity for the purpose of supplying the city and the inhabitants thereof with such service and utilities;" and this provision is followed by authority to purchase "appliances, equipment and machinery necessary or incident to the proper operation and maintenance of such public service plants and properties," and a large number of similar provisions all referring to "such public service plants or properties." The central thought conveyed by this language is the establishment of a plant for the distribution of heat in the same manner or by the same method as had been in use for many years in the furnishing of water and light to the inhabitants of the city, namely, by the establishment of a central plant from which public service was distributed. The language used contains no hint of any purpose of the people to grant to the city, to be exercised by its legislative body, the authority to enter into fields of private enterprise and into a business which had always theretofore been carried on by private individuals to the greater or less satisfaction of the public. To imply such a power from the language used would be to attribute to it a significance away beyond the general acceptation of the import of the terms. Implied powers, as the words themselves indicate, must find their justification and foundation in express power granted; that is, they are only implied *ex necessitate* that the express powers may be fully and completely exercised. The argument being that such powers must have been within the contemplation of the granting authority, as otherwise those expressly granted could not be carried out. No doubt the power is implied to establish a municipal coal and wood-yard for the purpose of supplying the *plant* for the distribution of heat; but this power differs essentially from a power to buy fuel and sell it to the inhabitants of the city in the ordinary course of trade.

Moreover, if the argument with reference to implied powers does not satisfy, it appears that the authority of the city over the particular subject in question has been

stated in section 13, art. II of the charter: "To provide for the inspection and weighing of hay and grain, and coal, the measuring of wood and fuel to be used in the city, and to determine the place or places of the same, and to regulate and prescribe the place or places of exposing for sale hay, coal and wood." While it is true that in the construction of municipal charters the rule *expressio unius est exclusio alterius* must be applied with caution (*State v. Bryan*, 50 Fla. 293, 297, 377) ; yet "the expression of one thing in the Constitution is the exclusion of things not expressed" (*Page v. Allen*, 58 Pa. St. 338) ; the above quoted provision of the charter strongly induces the thought, in view of that other canon of construction that different sections *in pari materia* are to be construed together, that it was not the intention of the electorate to grant to the city authorities the power contended for.

In *State v. Port of Seattle*, 104 Wash. 634, where authority was granted the Port to build cold storage plants and terminal icing plants, it was held that this did not "grant power to build a plant and engage in manufacture largely in excess of its needs and to sell to others engaged in retailing ice."

In *Keen v. Mayor and Council of Waycross*, 101 Ga. 588, it was held that a general power to erect and maintain a system of water-works did not entitle the city to enter the general plumbing business.

While it is true that the constitutional provision granting all cities the right to form their charters for their own government should be liberally construed in order that the beneficent intention thereof may be fully carried out (*Hockett v. State Liquor Licensing Board*, 91 Ohio St. 176), when it comes to a construction of the powers delegated by that charter to the city government, the rule of strict construction still obtains. As was said in *City of St. Paul v. Briggs*, 85 Minn. 290:

"It is a rule of general application that the authority

given municipal corporations to enact ordinances must be construed strictly (Dillon Mun. Corp. 91, note 2); and this rule should apply with special force to cities authorized to form and adopt their own charters."

"The power conferred upon municipal corporations by their charters to enact ordinances on specified subjects is to be construed strictly, and the exercise of the power must be confined within the general principles of the law applicable to such subjects."

We do not understand it to be claimed that the ordinance in question is referable to the general welfare section of the charter. To bring it within the police power to which this section refers, some public emergency would have to be shown, such as a coal famine, or monopoly, whereby the "government might be able to obtain fuel, when citizens generally could not. Under such circumstances we are of opinion that the government might constitute itself an agent for the relief of the community, and that money expended for the purpose would be expended for a public use." *Opinion of the Justices,* 182 Mass. 605. No such emergency is suggested.

We conclude that the establishment of a municipal fuel-yard for the purchase and sale of fuel at retail to the inhabitants of the city of Lincoln is not within the powers granted to the city council, and that the ordinance in question is invalid. The case is reversed and remanded to the district court for Lancaster county, with instructions to enter a decree perpetually enjoining the defendants from conducting a fuel business under the said ordinance.

REVERSED.