STATE, EX REL. WALTER M. HERBERT, APPELLEE, V. WALTER S. ANDERSON, CHIEF OF POLICE OF THE CITY OF LINCOLN, ET AL., APPELLANTS.

FILED MARCH 17, 1932. NO. 28096.

*Max Kier, Lloyd E. Chapman* and *Clark Jeary*, for appellants.

*Herman Ginsburg* and *Joseph Ginsburg, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

GOSS, C. J.

Relator was granted a peremptory writ of mandamus against the chief of police, the mayor and the building inspector, as respondents, ordering them to file complaints, cause arrests and proceed to recover fines and penalties against violators of a zoning ordinance, affecting certain lots in the city of Lincoln. Respondents have appealed.

The city of Lincoln is a city of the first class and operates under a home rule charter. April 23, 1929, its council passed a zoning ordinance, numbered 3039, under the powers granted by section 15-1003, Comp. St. 1929. By it the real property located between Thirtieth and Thirty-second and Apple and Y streets was classified as a residence district. This included all of lot C and the west 250 feet of lot B, both being a subdivision of block one in Peck's Grove Addition to the city, as well as a tract 66 feet wide and about 145 feet deep (marked "vacated" and evidently intended originally for a street) lying between the lettered lots. The only other classifications into which the city is divided are apartment, local business, commercial, and industrial districts. Section 3 provided that no premises in the city should be used except in conformity with the provisions applying to the particular district where classified. It provided that a lawful use of premises at the time of adoption of the ordinance, though not in conformity with the provisions of the ordinance, might continue until such nonconforming use is abandoned. Section 4 affirmatively stated the uses to

which premises in a residence district might be put and prohibited other uses.

Relator lived about a block north of the premises involved. The tract is slightly irregular in its measurements. It is about 705 feet long east and west and about 145 feet deep. Lot C comprises the west portion of the tract. On the north, the east and the west of it are homes. Across Apple street on the south is lot D and south of that is the main-line track of the Missouri Pacific Railroad Company to Union, still south of which is a considerable tract of tillable land on which corn was grown in 1931. There are no residences on lots B, C, the "vacated" strip, and D. Lot C has a small street-car barn formerly used as a garage for street cars used on the Bethany line, the main line of which was operated on the south side of Y street. This car line has switch tracks from the main line running southwesterly to the barn from about the middle of the west 250 feet of lot B. The Missouri Pacific Railroad Company also had transfer tracks coming from the southwest and connecting with the street railroad tracks. There was also a so-called "industrial track" or stub by which the tract could be served by switching cars and leaving them on the tract without interfering with the other tracks.

While respondents suggest that the tract was eligible for classification for industrial uses, and that it was a mistake not to classify it thus, we are faced with the fact that it was not so classified when the ordinance was passed in 1930. On April 11, 1930, Tri-State Cement Products Company began on the "industrial tract," near the west end of lot B, the manufacture of concrete pipes. This operation continued until June 2, 1931, about four days after this action was begun. They had no building. The concrete mixer was carried on a conventional truck devised for that purpose and having an engine used only in moving it. The mixer itself had a four-cylinder motor for power used in elevating and mixing the ingredients and in dumping them into the forms. No more than sev-

en men were used at any time and the maximum number of 94-pound sacks of cement used in a day was about 65. The pipes manufactured were in nine sizes, varying from 12 inches in diameter to 60 inches. An inspection of the daily reports shows that there were not many larger than 36 inches. After setting over night the forms would be stripped and the manufactured pipe would be lifted and set out of the way of the next day's operation. Usually there were only two periods each day, of an hour or so each, in which the mixing was carried on. Sometimes there were three such periods.

Each sack of cement was lifted by a man and emptied. He then tossed the sack aside. These operations caused some cement to be liberated in the form of dust and to be carried varying distances, depending upon the wind. Considerable noise was made and some gaseous odors were emitted in the operation of the mixer and its motor. As we have already shown, the premises in question were clearly used for manufacturing concrete pipe. This would be classified under the ordinance as a use permissible only in an industrial district. Section 3 of the ordinance also prohibits the use "for any trade, industry or purpose that is noxious or offensive by reason of the emission of odor, dust, smoke, gas, fumes or noise." In respect of this the district court found that the business was operated in such a manner as to violate all of the restrictions above quoted. While there was evidence of the emission of dust that was offensive to some of the residents nearby, that was due rather to the manner of handling the cement sacks than to the inherent nature of the business; as to the emission of smoke, gas and the noise, it is doubtful that the evidence of these things alone was sufficient to constitute a violation of this general section 3 of the ordinance relating to all five types of districts. So we prefer to consider the case on the ground that the general use of the premises for the purpose of manufacturing pipe was a use unauthorized by its classification in the ordinance as a residence district, rather than upon the manner in which the actual use was conducted.

Section 3 of ordinance 3039 also provides that an existing lawful use of premises at the time of the adoption of the ordinance, though not in conformity with the provisions of the classification under the ordinance, may be continued. Under this theory of a nonconforming use, the respondents claim exemption from the control of the court as prayed and allowed by the writ. The evidence does show that at times in years past these premises had been used for the mixing of concrete, taken away for use elsewhere for paving and other purposes, that to some extent shipments of cars of hay, lumber and coal, and once a load of live stock, had been unloaded there and taken away. These acts were not regular or continuous as were the acts of the Cement Products Company. So we are of the opinion that the evidence amply justifies the finding of the trial court that such prior use was an entirely different use from that of the manufacturing of pipe carried on at and for over a year before the time this action was commenced; and that the plea and proof do not warrant the claim of respondents in relation to a prior nonconforming use.

Respondents suggest that the classification of the property as residential works a confiscation of the property—in violation of the Fourteenth Amendment of the Constitution of the United States, in violation of the Bill of Rights of the Nebraska Constitution, and unenforceable. If the owner of the premises were here in a case where the question of the constitutionality of the ordinance or any part of it was involved in the issues, we would consider that phase. In a general way, prior to its amendment, we have held this very ordinance constitutional as against a claim that it discriminated against an owner's right to use his residence property for business purposes or for a fraternity house. *City of Lincoln v. Foss,* 119 Neb. 666; *City of Lincoln v. Logan-Jones,* 120 Neb. 827. But the respondents. are in no way injuriously affected by the classification of the premises in the ordinance passed by the present city council. The ordinance passed

under the home rule charter is subject to the same rules as to its constitutionality as if passed under the authority of a statute. The reason for this lies in the fact that in its proper realm the charter has the effect of a statute. *Consumers Coal Co. v. City of Lincoln,* 109 Neb. 51. Generally, "The court will not declare a statute unconstitutional at the suit of one who is not injuriously affected thereby." *State v. Hall,* 99 Neb. 95.

We believe the city council (who were made parties but dismissed) and the respondents acted in good faith but were mistaken as to their duties in the matter. The evidence shows they desired the zoning board of appeals to pass upon an application of the owners for a reclassification of the premises, the result of which they thought might do away with the necessity of filing complaints against violators of the ordinance as it then stood. Relator was not satisfied with this and demanded action Under the law and the terms of the zoning ordinance the duty of the respondents to prosecute the violations was clear. We have recently said: "To warrant the issue of mandamus against an officer to compel him to act, (1) the duty must be imposed upon him by law, (2) the duty must still exist at the time the writ is applied for, and (3) the duty to act must be clear." *State v. Barstler, ante,* p. 167.

For the reasons stated, the judgment of the district court is

AFFIRMED.