OMAHA & COUNCIL BLUFFS STREET RAILWAY COMPANY, APPELLEE, v. CITY OF OMAHA, APPELLANT.

FILED JANUARY 22, 1934. No. 28966.

826

Seymour L. Smith, Louis J. Te Poel and Philip N. Klutznick, for appellant.

Kennedy, Holland & De Lacy, contra.

Heard before Goss, C. J., Rose, Good, Eberly, Day and Paine, JJ., and Lovel S. Hastings, District Judge.

Goss, C. J.

The Nebraska state railway commission granted the application of the Omaha & Council Bluffs Street Railway Company for authority to curtail its transportation by buses in the city of Omaha. The city of Omaha appealed.

In considering this appeal we are bound by the established rule: "On an appeal from an order of the state railway commission, the finding of the commission will be given the same effect as the verdict of a jury, and the order will not be reversed unless it is clearly wrong." *Rawlings v. Chicago, B. & Q. R. Co.*, 109 Neb. 167. See *Byington v. Chicago, R. I. & P. R. Co.*, 96 Neb. 584; *Hooper Telephone Co. v. Nebraska Telephone Co.*, 96 Neb. 245; *Southern Nebraska Power Co. v. Taylor*, 109 Neb. 683, 689; *Farmers & Merchants Telephone Co. v. Orleans Community Club*, 116 Neb. 633, 635.

On the hearing before the commission it was ·shown that the applicant operates, as a common carrier, the Omaha street car system, consisting of about 135 single track miles of street railway and 44 round trip miles of bus lines in the city. It also operates as lessee about 28 single track miles of street railway in Council Bluffs, Iowa, and the Douglas street bridge over which the street cars pass between the two cities. These leased properties do not constitute any part of the Omaha street car system. The accounts and inventories of the company are so kept that there is no confusion in respect thereto.

On September 22, 1924, the commission fixed a valuation of the property used in the operation of the Omaha street car system at $14,100,000 and fixed 7 per cent. as the rate of return to which appellant was entitled on that valuation. On the hearing hereof that valuation was brought down to date, taking cognizance of additions and betterments and applying the requisite depreciation. This resulted in a valuation of $14,399,261, without the inclusion therein of any going concern value. The evidence showed the company to have outstanding first mortgage bonds amounting to $6,518,000, bearing interest at 5 per cent. per annum. The company's operating experience shows a deficit on the authorized return as follows, in round numbers: 1930, $590,000; 1931, $604,000; 1932, $690,000; first four months of 1933, $248,000. The history of operation shows a decrease in passengers hauled from 1913 to 1933. In 1920 passengers carried were 61,650,839. In 1932 they were 27,425,357, in both cars and buses. The first four months of 1933 showed a decrease of over 27 per cent. in passengers carried as compared with the same period in 1932. Notwithstanding hard times, the use of private automobiles has not abated. New competition has arisen through taxicabs and public cars, encroaching upon the field of mass transportation, by the carrying of several passengers for the fare of one. Because of the falling off in patronage the company has been unable to sell capital stock or bonds, but has

found it necessary to pay for additions and betterments out of cash reserve. The result has depleted this reserve to approximately $300,000. The commission finds that prudent management will not warrant further depletion of cash reserve; that the company has met the constant falling off in street car patronage by reduction in salaries and wages, by savings in the purchase of electric power, by progressive installation of one-man car operation, by consolidation of barns and rerouting of lines, but the possibilities of further economies of that nature are practically exhausted; and the only remaining possibility of savings is to eliminate needless or unjustified service.

For 15 years the company has neither earned nor paid dividends on its common stock. For more than 5 years the same applies to its preferred stock. During 1932 it paid only 3 per cent. on its bonded debt. Unless the first four months of 1933 were later bettered as to income, there was danger that it would not be able to pay 3 per cent. for that year. There is a provision in the mortgage securing these 5 per cent. bonds that, unless a minimum of 3 per cent. is paid annually, a default may be declared.

Upon the insistence of the city, the company, in 1925 and 1926, installed six bus lines and in 1929 and 1930 four additional bus lines. The street car system has been in operation more than 40 years. From the first the bus lines, taken either as a whole or separately, showed operating deficits. The total deficit began at about $25,-000 and has increased to about twice that amount yearly. The company being willing to carry on in part, in the hope that bettered conditions may justify it, asked and was allowed by the commission to stop service completely on certain lines, to curtail hours of service on some lines, and to curtail mileage on other lines.

Without going into further and unnecessary detail, we find that the evidence justified the findings of fact, which we have sought to condense, and the order based thereon. Under the rule of law, heretofore recited, we cannot disturb the findings of fact and order made by the Nebraska

state railway commission when it is based upon the facts, if that body, established by the Constitution, has jurisdiction.

Upon common-law principles, street railways have always been held by this court to be common carriers. *Spellman v. Lincoln Rapid Transit Co.,* 36 Neb. 890; *Pray v. Omaha Street R. Co.,* 44 Neb. 167; *East Omaha Street R. Co. v. Godola,* 50 Neb. 906; *Lincoln Street R. Co. v. McClellan,* 54 Neb. 672; *Lincoln Traction Co. v. Webb,* 73 Neb. 136. In 1906 the people of Nebraska adopted section 20, art. IV, as a part of the state Constitution, providing for a state railway commission and defining its powers and duties. After that (1929) this court has held that "Bus companies operating after the manner of the defendant herein are common carriers of passengers and are liable as other common carriers upon common-law principles." *Griffen v. Lincoln Traction Co.,* 118 Neb. 459.

Prior to the adoption of home rule charters for cities, we continued to hold that the Nebraska state railway commission has jurisdiction over street railways in cities of the state. *Herpolsheimer Co. v. Lincoln Traction Co.,* 96 Neb. 154; *In re Lincoln Traction Co.,* 103 Neb. 229; *Omaha & C. B. Street R. Co. v. Nebraska State Railway Commission,* 103 Neb. 695.

The city of Omaha asserts the commission erred in assuming jurisdiction and in holding that it had jurisdiction to pass upon the application of the street car company. The argument of the city is that, by virtue of its home rule charter, the municipality had the sole jurisdiction to pass upon the curtailment of the bus service here involved.

Section 5, art. XI, an amendment to the Constitution, providing for home rule charters, adopted in 1920, reads: "The charter of any city having a population of more than one hundred thousand inhabitants may be adopted as the home rule charter of such city by a majority vote of the qualified electors of such city voting upon the ques-

tion, and when so adopted may thereafter be changed or amended as provided in section 4 of this article, subject to the Constitution and laws of the state."

Section 20, art. IV of the Constitution, providing for the state railway commission, adopted in 1906, reads: "There shall be a state railway commission, consisting of three members, who shall be first elected at the general election in 1906, whose terms of office, except those chosen at the first election under this provision, shall be six years, and whose compensation shall be fixed by the legislature. Of the three commissioners first elected, the one receiving the highest number of votes, shall hold his office for six years, the next highest four years, and the lowest two years. The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision."

The city of Omaha argues that, assuming the two provisions above quoted are in conflict, the special provisions should control, citing *Elmen v. State Board of Equalization and Assessment*, 120 Neb. 141, to the effect: "When general and special provisions of a state Constitution are in conflict, the special provisions should be given effect to the extent of their scope, leaving the general provisions to control when the special provisions do not apply." We think this is a sound rule as applied to the case in which it was announced, but that it is not applicable here. There the two provisions of the Constitution under consideration both dealt with the veto power of the governor, one in general terms, the other with relation to the budget. Here one provision relates to regulatory jurisdiction over common carriers, specially committing to the commission "the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the

duties enumerated in this provision." Const. art. IV, sec. 20. On the other hand, the Constitution expressly provides that any home rule charter shall be "subject to the Constitution and laws of the state." Const. art. XI, sec. 5. If the people had intended to modify the jurisdiction of the railway commission, as argued by the city, it would have been easy to express the thought in unequivocal language. In 1925 the legislature adopted an act (Laws 1925, ch. 39) authorizing street railways to supplement their transportation by rail by adding motor propelled buses, but the first section (now section 74-1101, Comp. St. 1929) provided, in part: "Such bus service rendered by a street railroad or street railway, shall be subject to regulation as to rates, fares and service by the same regulatory body as street railway rates, fares and service are then regulated and controlled." As we view it, there is no conflict between the two quoted sections of the Constitution. The purpose of the framers was to leave the state railway commission with its jurisdiction and powers and to delegate to eligible municipalities, adopting home rule charters, a limited jurisdiction over matters of strictly municipal concern.

Cities having home rule charters are not subject to state legislation in matters purely municipal, but, upon such subjects as pertain to state affairs as distinguished from strictly municipal affairs, the provisions of the state Constitution and the general laws of the state are as applicable in a home rule municipality as they are elsewhere in the state. "The Constitution does not define which laws relate to matters of strictly municipal concern and which to state affairs. There is no sure test which will enable us to distinguish between matters of strictly municipal concern and those of state concern. The court must consider each case as it arises and draw the line of demarcation." *Carlberg v. Metcalfe,* 120 Neb. 481, reviewing cases.

Mass transportation of passengers by common carriers within the state is, and ought to be considered, under our

existing Constitution and laws, a matter of state concern. It would be anomalous to commit to a regulatory body, created by the Constitution, jurisdiction over intrastate steam railroads carrying passengers for hire everywhere within the state boundaries and to deny that jurisdiction over a carrier operating within a home rule charter municipality. Such a classification applied to intrastate steam railroads or to city street railways is not suggested by the Constitution and laws. To adopt it would subject the various municipalities of the state, now and hereafter having such transportation, to a chaotic lack of uniformity of regulation. We are of the opinion that the Nebraska state railway commission has jurisdiction over the street railway in the city of Omaha, notwithstanding that city is governed as to its municipal affairs by a home rule charter, and that the curtailment of bus service involved herein was not a matter of municipal concern to be regulated by the city council, but was subject to the jurisdiction and control of the commission.

The city of Omaha complains because the railway commission declined to hold hearings in Omaha. The commission refused on account of lack of funds appropriated and available. This was a matter within the discretion of the commission. Besides, it does not appear that the city was injured by the ruling.

The order of the commission is

AFFIRMED.