IN RE APPLICATION OF LINCOLN ELECTRIC SYSTEM. LINCOLN ELECTRIC SYSTEM, LINCOLN, APPELLANT, V. NEBRASKA PUBLIC SERVICE COMMISSION, APPELLEE, AND NEBRASKA TELECOMMUNICATIONS ASSOCIATION ET AL., INTERVENORS-APPELLEES.

655 N.W.2d 363

Filed January 10, 2003. No. S-01-286.

William F. Austin, of Erickson & Sederstrom, P.C., Douglas L. Curry, of Lincoln Electric System, and Mark J. Ayotte, of Briggs and Morgan, P.A., for appellant.

Jack L. Shultz and Gregory D. Barton, of Harding, Shultz & Downs, for intervenor-appellee Nebraska Telecommunications Association.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is an appeal of an order of the Nebraska Public Service Commission (Commission) dismissing an application for contract carrier permit authority filed by Lincoln Electric System (LES). LES appeals, arguing the Commission erred in determining that LES lacked legal authority to provide contract carrier telecommunications services.

## I. PROCEDURAL HISTORY

LES is an operating division of the city of Lincoln, a Nebraska municipal corporation and political subdivision of the State of Nebraska. On October 4, 2000, LES filed an application and request for authority with the Commission, seeking a contract carrier permit authorizing LES to provide competitive access transport services. In its application, LES sought authority to operate as a switchless facilities-based provider of dedicated digital information transmission services over its fiber-optic network facilities to and from customer user points.

The application identifies LES as a citizen-owned electric utility serving a 190-square-mile area surrounding the city of Lincoln. It states that LES provides electrical service to approximately 111,000 metered customers and also engages in wholesale power and energy transactions, including buying from and selling to other regional public utilities. According to the application, LES owns and maintains extensive fiber-optic facilities located throughout its authorized electric service area, which are used to meet LES' telecommunications needs through the interconnection of its operations center, generation stations, and substations. LES sought contract carrier permit authority to allow it

> to fully utilize its existing fiber optic system for the benefit of the Lincoln area by making these facilities available on a non-exclusive basis to provide digital transmission to and from user points within its requested geographic service area, including services to other licensed telecommunications carriers as a provider of competitive access services.

LES stated in its application that its proposed telecommunications services would not make use of the local or interexchange public switched telephone network and that it expected the proposed service to be "used primarily by business customers and governmental entities to meet their telecommunications needs."

The Nebraska Telecommunications Association (NTA) formally intervened in the matter. On November 9, 2000, the NTA filed a motion for declaratory relief alleging that LES lacked the legal authority to perform for-hire telecommunications services or to hold a contract carrier permit to perform such services. A hearing on the motion was held on December 11, 2000. On January 9, 2001, the Commission entered an order concluding

that LES did not have legal authority to provide for-hire telecommunications services. The Commission reasoned that no statute gave LES the requisite authority and that Lincoln's home rule charter, strictly construed, contained no express grant of such authority. One concurring commissioner found that the city had the requisite authority pursuant to its home rule charter, but had not delegated such authority to LES. After its motion for rehearing was denied, LES filed this timely appeal.

## II. ASSIGNMENTS OF ERROR

LES assigns that the Commission erred in (1) concluding that the charter of the city of Lincoln does not authorize the city to offer for-hire telecommunications services when such activity is not in contravention of any applicable constitutional or statutory provision; (2) applying a rule of strict construction, referred to as "Dillon's rule," to the limitation of powers charter under which the city of Lincoln currently operates and from which it derives its primary authority; (3) declaring that Neb. Rev. Stat. § 15-201 (Reissue 1997) does not permit the city of Lincoln to provide for-hire telecommunications services; and (4) concluding that the city of Lincoln does not have the inherent authority to make the efficient business judgment of offering its unused fiber-optic capacity for telecommunications purposes when it is engaged in the proprietary function of operating an electric utility.

## III. STANDARD OF REVIEW

The appropriate standard of review for appeals from the Nebraska Public Service Commission is a review for errors appearing on the record. *In re Proposed Amend. to Title 291*, 264 Neb. 298, 646 N.W.2d 650 (2002); *In re Application No. C-1889*, 264 Neb. 167, 647 N.W.2d 45 (2002). When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Application of Neb. Pub. Serv. Comm.*, 260 Neb. 780, 619 N.W.2d 809 (2000).

Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court. *Id.*

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law. *Douglas Cty. Bd. of Comrs. v. Civil Serv. Comm.*, 263 Neb. 544, 641 N.W.2d 55 (2002); *Gernstein v. Lake*, 259 Neb. 479, 610 N.W.2d 714 (2000).

## IV. ANALYSIS

### 1. MOOTNESS AND PREEMPTION

The question of law presented by this appeal is whether the Commission erred in determining that LES lacked the legal authority to operate as a for-hire telecommunications carrier. During the pendency of this appeal, the Nebraska Legislature enacted 2001 Neb. Laws, L.B. 827. Certain sections of this bill, originally codified at Neb. Rev. Stat. §§ 75-604(5) and 86-2302(2) (Supp. 2001), became effective on September 1, 2001. These statutes provided that the Commission "shall not issue . . . a permit . . . to an agency or political subdivision of the state" and that "[n]o agency or political subdivision of the state shall provide telecommunications services for a fee . . . or be issued . . . a permit as a telecommunications contract carrier." §§ 75-604(5) and 86-2302(2). We note that 2002 Neb. Laws, L.B. 1105, transfers § 75-604(5) to Neb. Rev. Stat. § 86-128(1)(b) (Cum. Supp. 2002), operative January 1, 2003, without substantive change. In addition, 2002 Neb. Laws, L.B. 1105, transfers § 86-2302(2) to Neb. Rev. Stat. § 86-575(2) (Cum. Supp. 2002), operative January 1, 2003, also without substantive change. Due to this recodification, we refer to the current statutes, rather than the statutes referenced by the parties. In its appellate brief and in a subsequently filed motion for summary dismissal, NTA asserted that the enactment of these statutory provisions rendered the issue presented by this appeal moot. LES filed an objection to the motion for summary dismissal and supporting brief in which it asserted that the pertinent provisions of L.B. 827 are preempted by the Telecommunications Act of 1996, 47 U.S.C. § 253 (2000), and are therefore unconstitutional under the Supremacy Clause of the U.S. Constitution. LES also addressed this issue in its reply brief, filed a separate "Notice of Constitutional Question," and served copies of its briefs assigning the unconstitutionality of L.B. 827 pursuant to Neb. Ct. R. of

Prac. 9E (rev. 2000). The Attorney General has not entered an appearance or filed a brief on this issue.

■ Although we overruled the motion for summary dismissal, the mootness issue has now been fully briefed and is before us. A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002); *Wilcox v. City of McCook*, 262 Neb. 696, 634 N.W.2d 486 (2001). The Nebraska statutory provisions enacted after the Commission's order at issue in this case would clearly prohibit the city of Lincoln and LES from seeking authority as a telecommunications contract carrier. Unless LES is correct in its assertion that these statutory provisions are preempted by federal law, the single issue presented in this appeal would be moot. We therefore address the preemption issue.

The federal statute upon which LES bases its preemption argument provides in part:

> **(a) In general**
>
> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of *any entity* to provide any inter-state or intrastate telecommunications service.
>
> **(b) State regulatory authority**
>
> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
>
> **(c) State and local government authority**
>
> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecom-munications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(Emphasis supplied.) 47 U.S.C. § 253. Federal courts inter-preting the statute generally hold that subsection (a) imposes a

substantive limitation on state and local governments, while subsections (b) and (c) are "safe harbors" or exceptions to the general prohibition stated in subsection (a). See, *Missouri Mun. League v. F.C.C.*, 299 F.3d 949 (8th Cir. 2002); *New Jersey Payphone Ass'n v. Town of West New York*, 299 F.3d 235 (3d Cir. 2002); *BellSouth Telecommunications v. Town of Palm Beach*, 252 F.3d 1169 (11th Cir. 2001).

Federal preemption arises from the Supremacy Clause of the U.S. Constitution and is the concept that state laws that conflict with federal law are invalid. *Eyl v. Ciba-Geigy Corp.*, 264 Neb. 582, 650 N.W.2d 744 (2002), citing U.S. Const. art. VI, cl. 2. There are three varieties of preemption: express, implied, and conflict preemption. *Id.* Express preemption arises when Congress has explicitly declared federal legislation to have a preemptive effect. It can also arise when a federal agency, acting within the scope of authority conferred upon it by Congress, has expressly declared an intent to preempt state law. *Id.* LES contends that express preemption arises from the plain language of 47 U.S.C. § 253(a) because it is an "entity" which Congress has determined may not be prohibited by the state from providing telecommunications services. Thus, it contends that §§ 86-128(1)(b) and 86-575(2) are preempted and unconstitutional. On the other hand, NTA argues that under rules governing federal statutory construction, the phrase "any entity" in 47 U.S.C. § 253(a) does not include municipalities which are traditionally subject to the overriding control of state legislatures, and thus the Nebraska statutes are not preempted. Both arguments are supported by case law.

NTA relies upon *City of Abilene, Texas v. F.C.C.*, 164 F.3d 49 (D.C. Cir. 1999), in which the U.S. Court of Appeals for the District of Columbia Circuit upheld a determination by the Federal Communications Commission (FCC) that § 253(a) did not preempt a Texas statute forbidding municipalities from providing telecommunications services. In its analysis, the court determined that § 253(a) must be construed in accordance with the precept enunciated in *Gregory v. Ashcroft*, 501 U.S. 452, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991), because "[t]o claim . . . that § 253(a) bars Texas from limiting the entry of its municipalities into the telecommunications business is to claim that

Congress altered the State's governmental structure." *City of Abilene, Texas*, 164 F.3d at 52. The precept of *Gregory, supra*, requires that if Congress intends to alter the usual constitutional balance between a state and its municipalities, it must make its intention " ' "unmistakably clear" ' " in the language of the statute. *Gregory*, 501 U.S. at 460, quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985) (specific holding superseded by statute). In *City of Abilene, Texas*, the court concluded that there was no such clarity in § 253(a), reasoning that the term " 'entity' " was not defined in the Telecommunications Act. 164 F.3d at 52. Noting that it was linguistically possible to include a municipality under the heading "entity," the court found that it was not enough under the *Gregory* standard that the statute *could* bear such meaning. *City of Abilene, Texas, supra*. Instead, the court focused on the fact that there was no textual evidence to suggest that Congress, in using the word "entity," deliberated over the effect such use would have on state-local governmental relationships. *Id.* Noting that *Gregory* requires construction of a statute in favor of state sovereignty when the text fails to indicate congressional intent to the contrary, the court held that § 253(a) did not preempt the Texas statutes. *City of Abilene, Texas, supra*.

A similar conclusion was reached by the Iowa Supreme Court in *Iowa Telephone Ass'n v. City of Hawarden*, 589 N.W.2d 245 (Iowa 1999). In that case, the court began its analysis with the "plain-statement rule" derived from *Gregory, supra*, that "the courts will not interpret a federal statute in such a way as to intrude upon an area traditionally regulated by the states absent a clear expression of congressional intent to do so." *City of Hawarden*, 589 N.W.2d at 251. Relying on the decision of the FCC in *City of Abilene, Texas* (which was affirmed on appeal by the D.C. Circuit Court as discussed above), the Iowa court held without significant additional analysis that § 253(a) did not prevent the State of Iowa from regulating the provision of telecommunications services by its political subdivisions.

Subsequent to the decisions in *City of Abilene, Texas, supra*, and *City of Hawarden, supra*, two courts have reached the opposite conclusion. In *City of Bristol, VA v. Earley*, 145 F. Supp. 2d

741 (W.D. Va. 2001), a municipality sought a declaratory judgment that a Virginia statute prohibiting local governmental entities from offering telecommunications services to the general public was preempted by § 253(a). The court acknowledged that the challenged law related to the relationship between states and their political subdivisions, an area traditionally regulated by states. It also affirmed the principle that when a federal statute touches on an area traditionally within the exclusive control of states, Congress must make its intention to preempt " 'clear and manifest' " based on *Gregory v. Ashcroft*, 501 U.S. 452, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991). *Earley*, 145 F. Supp. at 747. However, guided by Supreme Court decisions holding that the use of the modifier "any" denoted an unambiguous legislative intent to impart an expansive scope to a statutory term, the district court determined that Congress' use of the phrase " 'any entity' " made it " 'clear and manifest' " that § 253(a) was intended to have sweeping application, including application in those areas in which states traditionally enjoyed exclusive regulatory power. 145 F. Supp. at 747, citing *Salinas v. United States*, 522 U.S. 52, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997), and *United States v. Gonzales*, 520 U.S. 1, 117 S. Ct. 1032, 137 L. Ed. 2d 132 (1997). On this basis, the court held that the Virginia statute was preempted by § 253(a) and therefore invalid and unenforceable under the Supremacy Clause.

In *Missouri Mun. League v. F.C.C.*, 299 F.3d 949 (8th Cir. 2002), released after the instant case was argued and submitted, the U.S. Court of Appeals for the Eighth Circuit employed similar reasoning to conclude that a Missouri statute which prevented municipalities and municipally owned utilities from providing telecommunications services or facilities was preempted by § 253(a). In vacating an FCC order which relied heavily upon *City of Abilene, Texas v. F.C.C.*, 164 F.3d 49 (D.C. Cir. 1999), the court acknowledged its responsibility under *Gregory, supra*, to determine whether the statutory language plainly requires preemption. Focusing on the phrase " 'any entity,' " the court determined that the plain meaning of the term " 'entity' " included all business or governmental organizations, including municipalities. *Missouri Mun. League*, 299 F.3d at 953. Noting that "[t]ime and time again the Court has held that the modifier

'any' prohibits a narrowing construction of a statute," *id*. at 954, the court concluded that "Congress's use of [the term] 'any' to modify 'entity' signifies its intention to include within the statute all things that could be considered as entities." *Id*. at 953-54, citing, inter alia, *Gonzales, supra*, and *Salinas, supra*. Specifically rejecting the reasoning of *City of Abilene, Texas*, the court in *Missouri Mun. League* stated:

> The court, however, made no mention of the Supreme Court's cases regarding the effect of the modifier "any" on the modified term, referring instead to Congress's "tone of voice" regarding the term "any" and the "emphasis" Congress meant to place on different words. [Citation omitted.] . . . Whatever the reason for the D.C. Circuit's decision not to consider and discuss *Salinas* and like cases, we view the lack of such a discussion as detracting from the persuasiveness of its opinion. The Supreme Court has repeatedly instructed us regarding the proper manner of interpreting the modifier "any," and we follow that direction here.

299 F.3d at 955. The court therefore concluded that municipalities are included within the phrase "any entity" as used in § 253(a).

 Under the Supremacy Clause of the U.S. Constitution, state courts have a concurrent duty to enforce federal law. *Howlett v. Rose*, 496 U.S. 356, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990); *Preister v. Madison County*, 258 Neb. 775, 606 N.W.2d 756 (2000). The Supreme Court has not addressed the specific preemption issue before us, and in the absence of an interpretation of § 253(a) by the Court, we are not bound by any circuit court's interpretation. See *In re Search Warrant for 3628 V St.*, 262 Neb. 77, 628 N.W.2d 272 (2001). See, also, *Lockart v. Fretwell*, 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (Thomas, J., concurring) (state courts bound by Supreme Court's interpretation of federal law, but not bound by circuit court's interpretation); *Bromley v. Crisp*, 561 F.2d 1351 (10th Cir. 1977) (state courts may express differing views on federal questions until guided by binding decision of Supreme Court). Here, we are persuaded by the reasoning of the Eighth Circuit that under the rule of statutory construction applied by the Supreme Court in *Salinas v. United States*, 522 U.S. 52, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997), and other cases, Congress' use of the phrase

"any entity" in § 253(a) is indicative of an expansive statutory scope which includes a governmental entity, such as a municipally owned utility, seeking to provide telecommunications services. We conclude that §§ 86-128(1)(b) and 86-575(2) are absolute prohibitions which, as a matter of law, do not fall within the "safe harbor" provisions in § 253(b) and (c). Therefore, by virtue of the Supremacy Clause, §§ 86-128(1)(b) and 86-575(2) are preempted by federal law and are unconstitutional.

### 2. AUTHORITY TO OPERATE AS TELECOMMUNICATIONS CARRIER

Having concluded that LES is not *prohibited* by state law from seeking a certificate of public convenience and necessity to operate as a telecommunications carrier, we must now consider whether it is *authorized* to do so.

### (a) Statutory Authority

■ LES assigns that the Commission erred in declaring that § 15-201 does not permit the city of Lincoln to provide for-hire telecommunications services. This assignment, however, is not argued in the brief filed by LES. Errors that are assigned but not argued will not be addressed by an appellate court. *Caruso v. Parkos*, 262 Neb. 961, 637 N.W.2d 351 (2002); *Nicholson v. General Cas. Co. of Wis.*, 262 Neb. 879, 636 N.W.2d 372 (2001).

### (b) Charter Authority of City of Lincoln

LES also contends that the home rule charter of the city of Lincoln confers authority on LES to provide for-hire telecommunications services. This charter was adopted in 1917 pursuant to article XI, § 2, of the Constitution of the State of Nebraska. This provision of our constitution, adopted in 1912, permits a city having a population of more than 5,000 to "frame a charter for its own government, consistent with and subject to the constitution and laws of this state." Neb. Const. art. XI, § 2.

■ A charter defining powers and duties is essential to the creation and existence of a municipal corporation. 2A Eugene McQuillin, The Law of Municipal Corporations § 9.01 (3d ed. 1996). Historically, states were viewed as possessing all powers necessary for the protection of the general public, and thus a municipality or local city government could exercise only

those powers specifically granted to it by the sovereign state. See *id.* A legislature's grant of powers to a municipality is often referred to as a "legislative charter." See *id.*, § 9.07 at 177. Legislative grants of power are strictly construed pursuant to what has become known as Dillon's rule, which provides:

> "[A] municipal corporation possesses and can exercise these powers only: (1) Those granted in express terms; (2) those necessarily or fairly implied in, or incident to, the powers expressly granted; and (3) those essential to the declared objects and purposes of the municipality, not merely convenient, but indispensable."

*Consumers Coal Co. v. City of Lincoln*, 109 Neb. 51, 69-70, 189 N.W. 643, 650 (1922).

In 1875, the home rule charter was originated by the constitution of Missouri. 2A McQuillin, *supra*, § 9.08. Other states, including Nebraska, adopted similar state constitutional provisions allowing for the adoption of home rule charters. See Neb. Const. art. XI, § 2. The purpose of a home rule charter is to render the city as nearly independent as possible from state interference. *Mollner v. City of Omaha*, 169 Neb. 44, 98 N.W.2d 33 (1959); 2A McQuillin, *supra*, § 9.08. Legally, a home rule charter is simply another method of empowering a municipality to govern its own affairs. See *id.* While a legislative charter emanates from the sovereign legislature, a home rule charter has as its basis a constitutional provision enacted by the sovereign people authorizing the electorate to empower municipalities with the authority to govern their own affairs. See *id.* While legislative charters are always grants of power that are strictly construed, home rule or constitutional charters may be either grants of power or limitations of power. 2A McQuillin, *supra*.

As noted, the Nebraska Constitution authorized the city of Lincoln to adopt a home rule charter. Neb. Const. art. XI, § 2. The question of the nature and extent of the power granted to the electorate of a city by this constitutional provision was addressed by this court in *Consumers Coal Co., supra*. In that case, the plaintiff argued that there was no legal authority permitting the city to operate a public market for the purchase and sale of coal and wood. After examining the language of the Nebraska Constitution authorizing the adoption of home rule charters, we stated:

> We hold that the city may by its charter under the Constitution provide for the exercise by the council of every power connected with the proper and efficient government of the municipality, including those powers so connected, which might lawfully be delegated to it by the legislature, without waiting for such delegation. It may provide for the exercise of power on subjects, connected with municipal concerns, which are also proper for state legislation, but upon which the state has not spoken, *until* it speaks.

(Emphasis in original.) *Consumers Coal Co.*, 109 Neb. at 58-59, 189 N.W. at 646. We further held that "it was within the competency of the electorate of the city of Lincoln to adopt a charter which under settled principles of construction would be a limitation as distinguished from a grant of power." *Id*. at 66, 189 N.W. at 649. To determine what the people of the City of Lincoln did " 'with the sovereignty acquired by the adoption of a home rule charter,' " we held that it was necessary to examine the particular charter adopted in order to determine its effect. *Id*. A similar analysis is necessary in the instant case.

At the time *Consumers Coal Co.* was decided in 1922, article II, § 1, of the Lincoln Charter provided that " '[w]ithout denial or disparagement of other powers held under the Constitution and laws of the state, the city of Lincoln shall have the right and power' " to perform specifically enumerated functions. *Consumers Coal Co. v. City of Lincoln*, 109 Neb. 51, 67, 189 N.W. 643, 649 (1922). Based upon this language, we concluded that the charter was within that class of home rule charters that are construed to be grants of power, rather than limitations of power. As such, it was subject to the same principle of strict construction that was applicable to legislative grants of municipal charters. Finding no express grant of power authorizing the city to operate a private coal and wood market in the charter language, we concluded that the city lacked the authority to do so.

Article II of the Lincoln Charter, as amended in 1992, is significantly different. It provides in relevant part:

> The City of Lincoln shall have the right and power to exercise all municipal powers, functions, rights, privileges, and immunities of every name and nature whatsoever that

it is possible for it to have at the present and in the future under the constitution of the State of Nebraska, except as prohibited by the state constitution or restricted by this charter, and to exercise any powers which may be implied thereby, incidental thereto, or appropriate to the exercise of such powers. The city shall also have the right and power to exercise all municipal powers, functions, rights, privileges, and immunities of every name and nature whatsoever that now are, or hereafter may be, granted by the laws of the State of Nebraska to all cities and villages or applicable to cities of the primary class, provided that such laws are not inconsistent with this charter.

Lincoln Charter, art. II, § 1, approved by voters on May 12, 1992. Unlike the 1922 charter, the broad language in this current charter does not merely enumerate specified powers, but, rather, grants all powers possible to the city. We conclude that the present charter is a limitation of powers charter, not a grant of powers charter. As such, the rule of strict construction, or Dillon's rule, does not apply, and the Commission erred in examining the charter language for an express or implied grant of power. See, *Consumers Coal Co., supra*; 2A Eugene McQuillin, The Law of Municipal Corporations § 9.08 (3d ed. 1996). To determine whether the city of Lincoln possesses the requisite power to operate as a for-hire telecommunications carrier, we need only consider whether the charter's broad authorization to engage in municipal powers and functions encompasses the provision of for-hire telecommunications services.

(c) Is Provision of Proposed Services a Municipal Power?

NTA contends that the charter grants the city only "strictly municipal" powers. Brief for appellee at 31. It argues that the provision of for-hire telecommunications does not fall within this definition and is therefore precluded. LES, in contrast, argues that the limitation of powers charter grants the city all powers " 'which might lawfully be delegated to the municipality by the legislature.' " Brief for appellant at 26. Because the Legislature could confer authority to engage in for-hire telecommunications upon the city, LES contends that it, as an operating division of the city, necessarily possesses that authority. We conclude that NTA's

interpretation of the powers granted by a limitation of powers charter is too narrow, while LES' is too broad.

 NTA's contention that a limitation of powers charter grants a city authority in only matters of "strictly municipal" concern is based upon a misinterpretation of our prior law and a mischaracterization of the legal issue presented in this case. NTA relies upon cases interpreting the "subject to the constitution and laws of this state" language in Neb. Const. art. XI, § 2. This language requires that a provision of a home rule charter must yield to a conflicting state statute, unless the provision relates to a matter of "strictly municipal" concern. E.g., *Jacobberger v. Terry*, 211 Neb. 878, 320 N.W.2d 903 (1982). Contrary to NTA's assertions, however, this analysis does not mean that a home rule city may act in only those areas that are "strictly municipal." Instead, such an entity may act in all matters necessary or incidental to its government, although municipal action will take precedence over conflicting state action only if the matter is one of strictly local concern. See, *id.*; *Consumers Coal Co. v. City of Lincoln*, 109 Neb. 51, 189 N.W. 643 (1922).

NTA also misconstrues the legal issue present in the instant case. It contends that the state's regulation of telecommunications services through the Commission necessarily establishes that this is an area of statewide concern and that a municipality therefore cannot, pursuant to its home rule charter, act in a conflicting manner. This rationale would be applicable if LES was attempting to *regulate* the telecommunications field. However, the issue in this case is whether LES has the legal authority to *provide* for-hire telecommunications services pursuant to the Lincoln home rule charter. In the instant case, there is no question that if LES may lawfully provide the services, it is subject to regulation by the Commission. Compare *Omaha & C.B. Street R. Co. v. City of Omaha*, 125 Neb. 825, 252 N.W. 407 (1934) (holding home rule charter did not authorize city to regulate bus service contrary to state regulation). There is no conflict between state law and the charter in this case, and therefore the "strictly municipal" analysis is inapplicable.

LES' interpretation of the powers granted by a limitation of powers charter in Nebraska is incorrect because in *Consumers Coal Co.*, we recognized that such a charter adopted pursuant to

the Nebraska Constitution does not grant "unlimited" power to a city. Quoting *State ex rel. v. Telephone Co.*, 189 Mo. 83, 88 S.W. 41 (1905), we held:

"But it is not every power that may be essayed to be conferred on the city by such a charter that is of the same force and effect as if it were conferred by an act of the general assembly, *because the Constitution does not confer on the city the right, in framing its charter, to assume all the powers that the state may exercise within the city limits, but only powers incident to its municipality*; yet the Legislature may, if it should see fit, confer on the city powers not necessary or incident to the city government. There are governmental powers the just exercise of which is essential to the happiness and well being of the people of a particular city, yet which are not of a character essentially appertaining to the city government. Such powers the state may reserve to be exercised by itself, or it may delegate them to the city, but until so delegated they are reserved. *The words in the Constitution, 'may frame a charter for its own government,' mean may frame a charter for the government of itself as a city, including all that is necessary or incident to the government of the municipality, but not all the power that the state has for the protection of the rights and regulation of the duties of the inhabitants in the city, as between themselves.*"

(Emphasis supplied.) *Consumers Coal Co.*, 109 Neb. at 57, 189 N.W. at 645. Thus, the city may exercise every power *"connected with the proper and efficient government of the municipality, including those powers so connected,* which might lawfully be delegated to it by the legislature, without waiting for such delegation." (Emphasis supplied.) *Id.* at 58-59, 189 N.W. at 646. See, *Michelson v. City of Grand Island*, 154 Neb. 654, 48 N.W.2d 769 (1951); *Axberg v. City of Lincoln*, 141 Neb. 55, 2 N.W.2d 613 (1942). Pursuant to the "for its own government" limitation in our constitution, see article XI, § 2, the question is not whether the Legislature could have delegated the authority to provide for-hire telecommunications services to the city of Lincoln. Rather, the question is whether the provision of for-hire telecommunications services is an area that is necessary, incidental, or

connected with the proper and efficient government of the municipality of the city of Lincoln.

As we noted in *Consumers Coal Co. v. City of Lincoln*, 109 Neb. 51, 58, 189 N.W. 643, 646 (1922), resolution of this question is difficult for "[i]t is not easy in all cases to distinguish between municipal powers and state powers . . . ." Due to the difficult nature of the question, we must "content ourselves with the consideration of each case as it arises, applying those principles which precedent and logic approve." *Id.*

Our precedent indicates that a city's provision of retail services can be necessary or incidental to its proper and efficient government. This is particularly true in those circumstances where retail services are directly related to the provision of a public service. In *Consumers Coal Co.*, we impliedly held that the operation of a public market for the sale of wood and coal by the city was necessary or incidental to the proper and efficient government of the city. Four years later, we reached a similar conclusion in *Standard Oil Co. v. City of Lincoln*, 114 Neb. 243, 207 N.W. 172 (1926). In that case, an amendment to the Lincoln home rule charter expressly granted the city the power to engage in the business of selling gasoline and oil to the inhabitants of the city. The constitutionality of the amendment was challenged by a local business on the ground, inter alia, that the sale of gasoline and oil by the city " 'is not of, and does not pertain to, the government of said defendant city.' " *Id.* at 246, 207 N.W. at 173. We rejected the plaintiff's argument, noting that the use of the commodity of gasoline had so steadily increased that it was "well-nigh universal" and that thus, its provision by the city was for a public purpose. *Id.* at 251, 207 N.W. at 175. We held that the charter provision delegated power to the city so that it "may do that which the state may do." *Id.* at 252, 207 N.W. at 176.

Consideration of our precedent and the dictates of logic lead us to conclude that the provision of for-hire telecommunications services by the city of Lincoln is incidental to or connected with its powers of municipal government granted under its limitation of powers charter. Although the charter does not grant the city authority to do all that the state could do, provision of for-hire telecommunications, much like the provision of gasoline, serves a public purpose that is sufficiently related to the government of

the municipality of the city of Lincoln. See *Standard Oil Co., supra.* The city seeks to provide telecommunications services by making efficient use of the facilities it already uses to provide public utilities, thus providing a further connection between the provision of for-hire telecommunications services and the necessary and incidental powers of municipal government. See, also, *Speidell Monuments v. Wyuka Cemetery*, 242 Neb. 134, 493 N.W.2d 336 (1992) (finding cemetery organized as public corporation had implied power to sell grave markers and monuments); *Nelson-Johnston & Doudna v. Metropolitan Utilities District*, 137 Neb. 871, 291 N.W. 558 (1940) (finding metropolitan utilities district empowered to engage in business of supplying water and gas had implied authority to sell gas appliances).

Based upon the foregoing, the Commission erred as a matter of law in determining that the city of Lincoln lacked the legal authority to engage in the provision of for-hire telecommunications services.

### 3. AUTHORITY OF LES

The remaining question is whether the city of Lincoln has properly delegated its authority to provide for-hire telecommunications services to LES. LES is an operating division of the city of Lincoln. The Lincoln City Council gives LES all of its powers and responsibilities by ordinance. According to Lincoln Mun. Code § 4.24 (2001), LES is governed by the LES administrative board. Section 4.24.060 of the code sets forth the general powers and duties of the administrative board and provides in pertinent part: "The Lincoln Electric System Administrative Board shall have general control of the Lincoln Electric System of the City of Lincoln including the responsibility for the control and management of the property, personnel, facilities, equipment, and finances of said Lincoln Electric System." Section 4.24.070, which addresses the specific powers and duties granted to the board, further states: "The Board shall . . . (e) Do and perform all other acts necessary to efficiently maintain and operate the Lincoln Electric System including the management of the property, personnel, facilities and finances of the Lincoln Electric System, except those otherwise limited by the provisions of the ordinance."

LES argues that "[i]nherent in these provisions is the Administrative Board's mandate to maximize the use of all of LES's resources in order to efficiently manage its property and finances." Brief for appellant at 29. LES contends that productive use of its unused fiber-optic network falls within this mandate and that thus, the city council has authorized LES to engage in for-hire telecommunications services.

We disagree. LES is clearly authorized to provide electric service to citizens and businesses in Lincoln and the surrounding area in its capacity as a public utility. To the extent management of LES facilities and property relates to the provision of electric service, the city has delegated such authority to the LES board. However, use of LES' facilities or property for an entirely different purpose, i.e., the provision of for-hire telecommunications services, is not a use that can be fairly considered to be within the powers delegated to LES by the city. This is especially true because the ordinance gives the LES board the power to perform all acts *necessary* to the efficient operation of the electric system. The record does not reflect that the use of excess fiber-optic capacity for the provision of for-hire telecommunications services is *necessary* to the efficient operation of the electric system. Therefore, the city of Lincoln has not, at this time, properly delegated authority to LES to utilize the excess fiber-optic capacity for the provision of for-hire telecommunications services.

## V. CONCLUSION

For the foregoing reasons, §§ 86-128(1)(b) and 86-575(2) are preempted by federal law and are therefore unconstitutional under the Supremacy Clause of the U.S. Constitution. The current Lincoln home rule charter is a limitation of powers charter, and the Commission erred in applying a rule of strict construction to such charter. The Commission further erred as a matter of law in finding that the city of Lincoln lacked the legal authority to provide for-hire telecommunications services. However, because LES has not been authorized by ordinance to seek regulatory authority to provide such services, the Commission properly denied its application. We therefore affirm the denial of

the application on grounds other than those relied upon by the Commission majority.

AFFIRMED.