REQUESTED BY: Timothy J. Texel, Executive Director Nebraska Power Review Board
You have asked whether the Public Utility, Regulatory Policies Act of 1978 (PURPA), a federal law which requires electrical utilities to offer to purchase excess electricity from qualifying generation facilities, applies to publicly-owned electric utilities such as Nebraska's public power districts and municipalities. Secondly, you ask whether PURPA's provisions pre-empt Nebraska law requiring Power Review Board approval prior to commencement of construction of a generation facility from which any portion of the resulting electricity will be sold to other parties.
We understand that these questions have arisen because the Power Review Board has been asked to approve an application from a private individual or corporation to install a wind powered generator and connect it to the electric grid so that excess electricity may be sold. The answer to the question of PURPA's applicability to Nebraska's public power entities may bear upon the existence and extent of any conflict between federal and state law on the subject of the generation and marketing of electricity, which conflict, in turn, may bear upon the pre-emption issue.
 CONCLUSIONS:
1. PURPA's provisions regarding interconnection and related requirements that electrical utilities offer to purchase electric energy from, and sell electricity to, qualifying small power production facilities apply to Nebraska's electric utilities.
2. PURPA's provisions pre-empt Nebraska law giving the Power Review Board the authority over applications for the construction or grid-connection of electrical generation facilities, at least to the extent those facilities meet the PURPA definition of qualifying cogeneration facilities or qualifying small power production facilities.
 I. Applicability of PURPA
It is the public policy of the state to provide adequate electrical service at the lowest overall cost as possible, consistent with sound business practices, and in furtherance of such policy, electric service should be provided by nonprofit entities including public power districts, public power and irrigation districts, nonprofit electric cooperatives, and municipalities. Neb. Rev. Stat. § 70-1301 (2003). Reflecting the achievement of that "public power" goal, it has been reported that "Nebraska is unique among the States in the Union in that all generation, transmission and distribution service is provided by public entities, municipalities and cooperatives whose governing boards are responsible to, and serve at the voting pleasure of, the rate-payers they serve." Transmission Access Policy Study Group v. Federal Energy Regulatory Commission (FERC), 225 F.3d 667, 698 (D.C. Cir. 2000) (quoting NPPD's brief to the court). Such electric utilities are the focus of your first question.
As part of the Public Utility Regulatory Policies Act of 1978 (PURPA), Congress amended the Federal Power Act to encourage the development of cogeneration facilities and small power production facilities which generate electricity through less traditional energy sources such as biomass, waste, solar, wind, or hydropower. PURPA, Pub.L. No. 95-617, Sections 201, 202, 204, 210, 92 Stat. 3117, 3134-3136, 3138-3140, 3144-3147. Congress believed that increased use of the above mentioned sources of energy would reduce the demand for traditional fossil fuels and reduce the reliance on foreign oil. The perception was that development of alternative energy facilities had been impeded by state and federal regulatory burdens and reluctance of traditional electric utilities to sell power to, and purchase power from, the nontraditional facilities. FERC v. Mississippi, 436 U.S. 742,750-51, 72 L. Ed. 2d 532, 541, 102 S.Ct. 2126 (1982). To address these impediments, Congress authorized FERC to promulgate rules to encourage cogeneration and small power production, including rules (1) requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities, and (2) relieving the specified facilities from some regulatory burdens. Id. at 751, 72 L. Ed. 2d at 541-42, 102 S.Ct. 2126. The FERC regulations have been in place since 1980, 18 CFR Part 292; 45 Fed.R. 12214 et seq. (1980), and have been amended or supplemented over the years. FERC's rules regarding interconnection and the price electric utilities must pay for the electricity from qualifying facilities have been discussed and upheld in American Paper Institute, Inc. v. American Electric Power Service Corporation, 461 U.S. 402, 76 L. Ed. 2d 22, 103 S.Ct. 1921
(1983).
PURPA § 210(f) [16 U.S.C. 824a-3(f)] indicates that each state regulatory authority having ratemaking authority over electric utilities, as well as nonregulated electric utilities, are to implement the FERC rules or amendments thereto. FERC is authorized to maintain an enforcement action against the state regulatory authority or nonregulated electric utility for failure to comply with the mandate. PURPA § 210(h)(2)(A) [16 U.S.C. § 791a]. An affected entity may go directly to FERC for an order requiring the connection between the small power production facility and the electric utility, plus the exchange of electric energy to carry out the purposes of such connection order. If an increase in the transmission capacity of the electric utility is required as a result of the connection, it appears that this, too, may be ordered. PURPA § 202 [16 U.S.C. § 824i].
Are Nebraska's electric utilities governed by the FERC regulations and do they need to accommodate a qualifying small power producer's request to connect to the electric grid, to sell them power, and to purchase excess generation from them? We believe the answer may be found in the definitions included within PURPA. Title II of PURPA, the title which includes the provisions at issue here, begins with a section adding a number of definitions to those already found in the Federal Power Act. PURPA 95-617, Section 201 (92 Stat. 3134). These definitions may be found at 16 U.S.C. § 796(17)-(22). The last of these is a definition of "electric utility." The term means "any person or State agency (including a municipality) which sells electric energy; such term includes the Tennessee Valley Authority, but does not include any Federal power marketing agency." The parenthetical reference to a municipality was added as part of the Energy Policy Act of 1992. Pub.L. 102-486, Section 726(b), 102nd Congress, 2nd Sess., 1992; 106 Stat. 2921. The definition of "municipality" is broad, including not only the local governmental unit one normally thinks of, but also counties, irrigation districts, drainage districts, or other political subdivision or agency of a state competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power." 16 U.S.C. § 796(7) (2000). Note, too, that the introductory definitions found in section 3 of PURPA define "State agency" as "a State, political subdivision thereof, and any agency or instrumentality of either."16 U.S.C.A. § 2602(16) (2000). Therefore, when the term "electric utility" is used in Title II of PURPA, such as in the amendments codified at 16 U.S.C. § 824a-3 and § 824i, we believe it would include Nebraska's public electric utilities.
That Congress recognized it was extending FERC's reach to include such electric utilities is evidenced by PURPA's § 204(b)(1) which amended § 201(b) of the Federal Power Act to include a statement that certain of the amendments, including the section having to do with interconnection of small power producers, "shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this Chapter with respect to such provisions. Compliance with any order of the Commission under the provisions of § 824i [Interconnection] or 824j [Wheeling] of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence." See 16 U.S.C. § 824(b)(2).
The sprinkling of PURPA and Energy Policy Act provisions in various places in the U.S. Code may have contributed to uncertainty about whether public utilities like those in Nebraska were meant to be covered. Contributing to the uncertainty may have been 16 U.S.C. § 824(f), which states that no provision in the subchapter shall apply to the United States, a state, or any political subdivision of a state, or any agency or instrumentality of the same "unless its provision makes specific reference thereto." Mention might also be made of Nixon v. Missouri Municipal League, ___ U.S. ___, 158 L.Ed.2d 291, 124 S.Ct. 1555 (2004), where the Court interpreted the words, "any entity" in a federal statute designed to encourage competition in the telecommunication field as not encompassing entities which were political subdivisions of the state. The Court's decision was partly based on the fact that an expansive interpretation would cause the federal provision to conflict with state law. The Court concluded that the words did not provide the clear statement required for federal pre-emption of a state statute, so the Court interpreted the words accordingly. It is believed the present scenario is distinguishable. The definition of "electric utility" supplied by PURPA and the Energy Policy Act's clarifying inclusion of municipal utilities, in our opinion, are sufficiently clear reflections of Congress' intent to subject municipal and state political subdivision utilities to PURPA's provisions.
From material you provided with your inquiry, it appears the uncertainty may also be attributable to a belief held by one or more Nebraska utilities that the State's sovereignty would be impermissibly infringed if the federal law was understood to give FERC authority to dictate to a Nebraska utility who the utility must connect to, buy from, how much it must pay, and so forth. Such concern is rooted in theTenth Amendment of the U.S. Constitution, which gives assurance that powers not delegated by the Constitution to the federal government, nor prohibited by it to the States, are reserved to the States or to the people.
It is likely that FERC v. Mississippi, 456 U.S. 742,72 L. Ed. 2d 532, 102 S.Ct. 2126 (1982), will be deemed to have answered the question about whether Congress has authority in this area. The Commerce Clause was found to be a sufficient predicate for Congressional action. We see no weakening of the perceived link to interstate commerce in the Court's more recent decisions in the energy arena. In New York v. FERC, 535 U.S. 1, 152 L. Ed. 2d 47, 122 S.Ct. 1012 (2002), it was observed that, "it is only in Hawaii and Alaska and on the `Texas interconnect' — which covers most of that state — that electricity is distributed entirely within a single state. In the rest of the country, any electricity which enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce." Id. at 7, 152 L. Ed. 2d 56, 122 S.Ct. 1012 (footnote omitted, emphasis added). Too, the Commerce Clause may not have been the sole predicate for Congressional action. Congress indicated that its motivation for PURPA was for the protection of public health, safety and welfare, and the preservation of national security, as well as the regulation of interstate commerce. 16 U.S.C. 2601, Public Law 95-617 § 2, 92 Stat. 3117, 3119 (1978).
The Court in the past acknowledged the existence of some aspects of state sovereignty which cannot be overridden by Congress, at least under power Congress has derived from the Commerce Clause. The test once was whether Congress had intruded into areas of traditional government functions of the States, but the test was found to be unworkable and inconsistent with established principles of federalism. See Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 83 L. Ed. 2d, 1016,105 S.Ct. 1005 (1985) (State Mass Transmit System employees are covered by Fair Labor Standards Act (FLSA)), overruling National League of Cities v. Usery, 426 U.S. 833, 49 L. Ed. 2d 245, 96 S.Ct. 2465 (1976) (State Employees are not subject to FLSA), in turn overruling Maryland v. Wirtz, 392 U.S. 183, 20 L. Ed. 2d 1020, 88 S.Ct. 2017 (1968) (FLSA may constitutionally be applied to public school and hospital employment). After Garcia, the focus is more upon whether Congress has authority to regulate the subject matter under the Commerce Clause, rather than upon whether the regulation intruded into an area traditionally reserved to the states. The Garcia court concluded that it was the structure of the Government; the political process itself, which primarily ensures that laws which unduly burden the states will not be promulgated. But the Court has also made it clear that it will not always defer to the ballot box. The Court still will intercede to protect state sovereignty from undue intrusion. For instance, it has been said that Congress may not commandeer the States' legislative processes by directly compelling them to enact and enforce a federal regulatory program. New York v. United States, 505 U.S. 144, 161, 120 L. Ed. 2d 120, 140, 112 S.Ct. 2408 (1992); Hodel v. Virginia Surface Mining and Reclamation Association, Inc.,452 U.S. 264, 69 L. Ed. 2d 1, 101 S.Ct. 2352 (1981).
Here, interpreting PURPA's provisions to include utilities run by political subdivisions and municipalities would primarily affect the state or municipal instrumentality in its capacity as a utility rather than in its capacity as a regulator. State regulatory authorities which are given obligations under PURPA are those which have ratemaking authority. Nebraska's regulatory entities such as the Power Review Board may not acquire any affirmative obligations under PURPA as their authority in the area of regulation of electric rates is limited. Consequently, Nebraska utilities probably will be treated as nonregulated utilities for purposes of the cogenerator and small power producer provisions. See16 U.S.C.A. § 2602(17) (2000). Although federally imposed burdens on state executive branch officers or entities have been successfully challenged on grounds that they unduly infringe on state sovereignty, See Printz v. United States, 521 U.S. 898, 138 L. Ed. 2d 914, 117 S.Ct. 2365
(1997) (Brady Act provision requiring state and local law enforcement officers to do criminal history checks on prospective purchasers of firearms), and New York v. United States, 505 U.S. 144,120 L. Ed. 2d 120, 112 S.Ct. 2408 (1992) (Constitution does not permit Congress simply to transfer title to radioactive waste from generators to state governments or to threaten the same to coerce the states into regulating pursuant to Congress' direction), we are inclined to believe that the present scenario would be viewed as more analogous to Garcia, where the federally imposed burdens arose from a law of more universal application. Here, it is doubtful that a court considering the question will view Nebraska as having been involuntarily conscripted as a regulatory arm of the federal government as was the case in Printz and New York v. United States. We believe it is constitutionally permissible to apply PURPA to Nebraska's electric utilities.
 II. Federal Pre-emption
Next, you ask whether PURPA pre-empts Nebraska law giving the Power Review Board the authority over applications to build or install facilities to produce electricity for sale. See Neb. Rev. Stat. §§70-1012 and 7-1014 (2003).
While PURPA aims to encourage the development of non-traditional forms of electrical generation; ones that do not rely so heavily on the burning of fossil fuels, the focus of state law is upon generation of electricity at the lowest cost and without duplication of facilities. See Neb. Rev. Stat. §§ 70-1001 and 70-1501 (2003). One of the things the Legislature did in furtherance of this policy and goal was to give the Nebraska Power Review Board review authority over a supplier's construction of electric generation facilities. Neb. Rev. Stat. §70-1012 (2003). "Electric suppliers or suppliers of electricity" means "any legal entity supplying, producing, or distributing electricity within the State for sale at wholesale or retail." Neb. Rev. Stat. §70-1001.01(2) (2003).
One preliminary question the reader may have is whether the Power Review Board has anything to do with private generating facilities, since Nebraska law focuses on public power entities. If a private individual or corporation who proposes to generate electricity for sale is not subject to Power Review Board oversight, then the question of pre-emption of the Board's pre-construction review and approval responsibility may disappear. However, some years ago, in an opinion you authored while serving as an Assistant Attorney General, this office concluded that the permit requirement found in Neb. Rev. Stat. § 70-1012 was not limited to public entities. It extends to proposed private electric power plants, too. Op. Att'y Gen. No. 96-073 (Nov. 4, 1996).
The 1996 opinion did not address whether someone just entering the field would be covered by the statutes. This question arises because Neb. Rev. Stat. § 70-1012 is aimed at suppliers and the statutory definition of "electric suppliers" refers to a legal entity supplying, producing, or distributing electricity within the state. It is not put in terms of someone who is proposing to get into the business. A similar issue may arise in the case of a person who builds a generating facility to meet his own needs, but later discovers that he has an excess supply. The person did not need a permit initially, but is one required before he connects to the grid to sell electricity? You have advised that the Board has taken the position that in both cases the person or entity must obtain Board approval before construction or connection and sale, as the case may be. So we will proceed with our discussion based upon the foregoing interpretations of state law.
The criteria for the Power Review Board's review of the application of the would-be generator and seller of electricity is set forth in Neb. Rev. Stat. § 70-1014 (2003). With the exception of an allowance placed into law in 2003 for nontraditional generation projects launched by public utilities and cooperatives, for which a less stringent review has been prescribed, before approving an application the Board must find that it will serve the public convenience and necessity and that the applicant can most economically and feasibly supply the electric service resulting from the proposed construction without unnecessary duplication of facilities or operations.
U.S. Constitution art. VI, cl. II, provides that, "this Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . ., shall be the supreme Law of the Land . . . ." The federal concept of pre-emption arises from this clause and is the concept that state laws in conflict with federal law are invalid. In re Application of Lincoln Electric System, 265 Neb. 70, 76, 655 N.W.2d 363,369 (2003). Although the United States Supreme Court in the Nixon case, supra, disagreed with the Nebraska Supreme Court's interpretation of federal law in the Lincoln Electric System case, the case is still instructive regarding pre-emption principles. "There are three varieties of preemption," the court wrote, "express, implied and conflict preemption." Id. at 76, 655 N.W.2d at 369, citing Eyl v. Ciba-Geigy Corp., 264 Neb. 582, 650 N.W.2d 744 (2002). The court went on to explain that express pre-emption arises when Congress or a federal agency, acting with the authority vested in it by Congress, has explicitly declared the Federal legislation or administrative dictate, respectively, to have a pre-emptive effect. Id. Implied and conflict pre-emption were addressed in Freightliner Corp. v. Myrick, 514 U.S. 280, 131 L.Ed.2d 385,115 S.Ct. 1483 (1995): "[A] federal statute implicitly overrides state law either when the scope of the statute indicates that Congress intended federal law to occupy a field exclusively, English v. General Electric Company, 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L. Ed. 2d 65 (1990), or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.' Hines v. Davidowitz, 312 U.S. 52, 67, [61 S.Ct. 399,85 L. Ed 581] (1941)'." Freightliner Corp., 514 U.S. at 287,131 L.Ed.2d at 392, 115 S.Ct. 1483. "Congress' inclusion of an express pre-emption clause `does not bar the ordinary working of conflict pre-emption principals.'" Sprietsma v. Mercury Marine, 537 U.S. 51, 65,123 S.Ct. 518, 154 L. Ed 2d 466 (2002), quoting from Geier v. American Honda Motor Company, 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L. Ed. 2d 914
(2000) (emphasis in original). Where there is a controversy over whether a state authority conflicts with, and consequently is displaced by, the existence of Federal Government authority, then one is to start with the assumption that the historic police powers of the States were not to be superseded unless that was the clear and manifest purpose of Congress. New York v. FERC, 535 U.S. 1, 17-18, 122 S.Ct. 1012, 152 L. Ed. 2d 47
(2002).
It is our view that Neb. Rev. Stat. §§ 70-1012 and 70-1014 conflict with federal law to the extent they apply to the generation facilities which Congress sought to encourage through PURPA; facilities which would meet the definitions in federal law and regulation of a qualifying small power production facility or qualifying cogeneration facility.16 U.S.C. § 796(17)(C), 16 U.S.C. § 796(18)(B), and 18 C.F.R. part 292. Nebraska law and policy operate as a practical bar to their construction and grid-connection, contrary to PURPA's goals. We believe such facilities, whether proposed or being connected to the grid post-construction, are exempt from the Power Review Board's cost-based and non-duplication-based review.
Please note that this does not mean that the Board is compelled to grant its approval. It only means that Board approval is not required for those particular facilities. Also note that Congress has sought to make clear that it did not intend to pre-empt the entire field. The States continue to be allowed authority over the siting of facilities and environmental protection. 15 U.S.C. § 79, note, which had its source in section 731 of the Energy Policy Act of 1992, Public Law 102-486, and18 C.F.R. § 292.101(b)(1)(ii).
Sincerely,
 JON BRUNING Attorney General
 Mark D. Starr, #16164 Assistant Attorney General
Approved by:
____________________________ Attorney General